STATE OF CONNECTICUT *v.* DWIGHT PINK, JR.
(SC 16971)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued November 29, 2004—officially released July 5, 2005

*Norman A. Pattis,* for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. A jury found the defendant, Dwight Pink, Jr., guilty of murder in violation of General Statutes § 53a-54a (a),[1] tampering with evidence in violation of General Statutes § 53a-155 (a) (1), conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), conspiracy to tamper with evidence in violation of §§ 53a-48 (a) and 53a-155 (a) (1), criminal possession of a pistol in violation of General Statutes § 53a-217c (a) (1), threatening in violation of General Statutes (Rev. to 1999) § 53a-62 (a) (2), tampering with a witness in violation of General Statutes (Rev. to 1999) § 53a-151 (a) and intimidating a witness in violation of General Statutes § 53a-151a (a) (1). The jury also found the defendant guilty of committing a class A, B or C felony with a firearm in violation of General Statutes § 53-202k. The trial court rendered judgments of conviction and the defendant appealed to this court.[2] The

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] The defendant originally appealed to the Appellate Court. Pursuant to General Statutes § 51-199 (b) (3), however, "an appeal in any criminal action involving a conviction for a . . . felony . . . for which the maximum sentence which may be imposed exceeds twenty years" shall be taken directly to this court. Accordingly, we transferred the appeal to this court pursuant to § 51-199 (c) and Practice Book § 65-4.

defendant claims on appeal that his convictions should be reversed on the grounds that: (1) the state's untimely disclosure of exculpatory material on multiple occasions violated his constitutional right to a fair trial; and (2) the trial court improperly denied the defendant's motion to suppress a document seized from the defendant's person while he was being held as a pretrial detainee.[3] We affirm the judgments of the trial court.

The jury reasonably could have found the following relevant facts. The victim, Scott Rufin, was last seen at 9 p.m. on April 13, 1998, leaving the Sol-E-Mar Café in Old Saybrook with Marc Celeste. On March 3, 2000, the defendant made an unscheduled visit to his probation officer, Paul Griffin. The defendant appeared to be intoxicated. Griffin had an acquaintance who was recently involved in a fatal shooting. He found the defendant's demeanor to be extremely similar to the demeanor of his acquaintance, so he asked the defendant if he had ever killed anyone. The defendant responded, "Yes, I shot him in the head five times." Because there was a lot of commotion at the probation office, Griffin decided to drive the defendant to a nearby coffee shop to get coffee and talk. During their conversation, the defendant indicated that he had shot the victim, whom he did not identify, in the back of the head with a .357 magnum and then shot him four times in the left side of the head with a .32 caliber handgun.

---

[3] The defendant also claims that the trial court abandoned its neutral role when it granted the state's motions for protective orders but has failed to brief this claim. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003).

After they finished their coffee, Griffin and the defendant left the coffee shop in Griffin's car. At that point, the defendant, using the plural for the first time, indicated that he and another person had stabbed the victim several times in the chest and that "they" had taken the body behind a building to "bleed" it. The defendant also began to direct Griffin where to drive. When Griffin stated that he was going to go back to his office, the defendant said, "[N]o. We're going. And if you tell anyone, I'm going to hang you from a tree and skin you alive and make your kids watch."

The defendant directed Griffin to drive to Cockaponset state forest (state forest) and led Griffin to an area where Griffin saw a set of decomposed ribs that he assumed belonged to the victim. Griffin then drove the defendant back to Middletown. During the drive, the defendant indicated that the murder had been "a hit from Bridgeport," and that, if he had not done it, "they'd kill [his] family." He also identified the victim as Rufin for the first time and said that the murder had taken place at "his partner's" residence in Old Saybrook. After Griffin dropped off the defendant, he went back to his office and told his supervisor what had happened. The supervisor directed Griffin to call the state's attorney's office. An inspector from that office told Griffin to go to the Killingworth state police barracks, where Griffin gave a statement about what had happened that morning. Griffin then returned to the state forest with state police investigators and led them to the set of decomposed ribs. The investigators concluded that the ribs belonged to a deer. Griffin then accompanied the investigators back to the police barracks, where he called the defendant. Griffin told the defendant that he had returned to the state forest with his brother and that they had determined that the ribs belonged to a deer. The defendant insisted that the victim's body was there, but deeper in the woods. Later

that afternoon, the state police returned to the state park and discovered the victim's remains.

On March 5, 2000, the state police arrested the defendant on charges of tampering with evidence, interfering with an officer, tampering with a witness and threatening. After his arrest, the police questioned him about the murder. The defendant indicated that, on the night of the murder, he was awoken by a man, whom he refused to identify, as he was sleeping with his girlfriend, Justine Ewart. The man said that he needed the defendant's help and drove him to a residence in Old Saybrook. After arriving at the residence, the man shot the victim in the back of the head with a "big gun" and then shot him in the head multiple times with another smaller gun. Because the victim was still breathing, the man stabbed him six or more times in the chest. Thereafter, the defendant and the man wrapped the victim's body in a tarp, placed it in the back of an automobile and drove to the state forest where they dragged it into the woods. Ewart testified at trial that the man who had awakened the defendant was Celeste.

Thereafter, the defendant was charged with murder, tampering with evidence, conspiracy and criminal possession of a pistol or revolver. Prior to trial, the state filed and the trial court granted three protective orders pursuant to Practice Book §§ 40-40[4] and 40-41.[5] The first

---

[4] Practice Book § 40-40 provides: "Upon the filing of a motion for a protective order by either party and after a hearing thereon, the judicial authority may at any time order that disclosure or inspection be denied, restricted or deferred, or that reasonable conditions be imposed as to the manner of inspection, photographing, copying or testing, to the extent necessary to protect the evidentiary values of any information or material."

[5] Practice Book § 40-41 provides: "In deciding the motion for a protective order the judicial authority may consider the following:

"(1) The timeliness of the motion;

"(2) The protection of witnesses and others from physical harm, threats of harm, bribes, economic reprisals and other intimidation;

"(3) The maintenance of secrecy regarding informants as required for effective investigation of criminal activity;

"(4) The protection of confidential relationships, privileges and communications recognized by law; and

"(5) Any other relevant considerations."

protective order was filed on September 11, 2000. It is not clear from the record what materials were covered by the order, which is not at issue in this appeal. The second protective order, filed on June 18, 2001, covered the records of a criminal investigation against Griffin.[6] The third protective order, filed on July 9, 2001, covered certain audio recordings and transcripts of wiretap conversations between a confidential informant and Celeste.

Shortly before trial was scheduled to commence, the state's attorney reviewed the materials covered by the third protective order and determined that, "out of an abundance of caution," the materials should be disclosed to the defendant. Accordingly, on September 27, 2002, the last day of jury selection, the state filed a fourth protective order in which it requested that the court vacate the third protective order. The state also requested that the names of all individuals, except for Celeste and the defendant, be redacted from the materials before they were disclosed to the defendant. The court granted the motion and the redacted tapes and transcripts were disclosed to the defendant.

On October 1, 2002, the first day of trial, the defendant requested that, in light of the recent developments with respect to the third protective order, the trial court review the materials covered by the first and second protective orders to determine whether they were subject to disclosure. The court agreed to review the materials, but indicated that it did not want to delay the commencement of evidence. It also indicated that, if it discovered any materials that should have been disclosed to the defendant, it would allow the defendant to recall witnesses for further cross-examination.

Later that day, the state called Eugene Heiney, a detective with the Old Saybrook police department,

---

[6] The criminal investigation into Griffin has nothing to do with this case.

as a witness. When the defendant attempted to cross-examine Heiney about the transcripts of the wiretapped conversations between Celeste and the informant, the state objected on the grounds that the transcripts were hearsay and that the defendant had not made a showing of third party culpability. After hearing arguments on the admissibility of the transcripts, the trial court indicated that it wanted to review the law on third party culpability and that it would make a ruling on the evidence the next day. When court reconvened the next morning, the court heard additional arguments on the admissibility of the transcripts and ruled that they were not admissible because the defendant had not made a sufficient showing that Celeste was unavailable to testify. The court indicated, however, that, if the defendant at some future point were to make a showing that Celeste was unavailable, it would reconsider the ruling.

Also on the morning of October 2, 2002, the state indicated that, upon reviewing the materials covered by the third protective order, it had discovered a ten page police report containing information gathered from a confidential informant that Celeste had bragged about killing the victim and that the murder had been a contract murder ordered by Celeste's uncle in Bridgeport. The state provided a redacted copy of the report to the defendant. The defendant moved for a mistrial on the ground that the report constituted exculpatory evidence within the meaning of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The trial court denied the defendant's motion, but granted his motion for a continuance until October 7, 2002, in order to investigate the facts contained in the report.

On October 4, 2002, the trial court, after conducting an in camera review of the materials covered by the first and second protective orders, concluded that the materials covered by the second protective order con-

tained information relating to the bias, motive, interest and credibility of a key witness, Griffin, and ordered that copies of the documents be delivered to the defendant. The trial court also ordered another continuance until October 8, 2002, to allow the defendant to investigate the newly disclosed materials.

On October 8, 2002, the defendant renewed his motion for a mistrial. Defense counsel argued that he had intended to call the defendant to testify about Celeste's role in the killing, "which is always a very momentous decision in any criminal case because no one testifies without getting hurt." The transcripts disclosed by the state had caused him to change that strategy. He stated that he had made strenuous efforts to locate Celeste, but had been unable to determine whether he was available to testify. The trial court inquired whether suspending the state's examination of Heiney until the question of the admissibility of the transcripts was resolved would adequately address the defendant's concerns and the defendant responded that a suspension would address his concerns "in part . . . ." The trial court denied the motion for a mistrial but agreed to suspend Heiney's testimony. The court also indicated that it would give a curative instruction to the jury when evidence resumed on October 9, 2002, to explain the break in the testimony.

Also on October 8, 2002, the state filed a motion in limine to preclude the defendant from cross-examining Griffin about the criminal investigation against him. The court ruled that the defendant could not question Griffin on the specific nature of the conduct that was under investigation but that he could ask about the existence of the investigation. The court also allowed the defendant to question Griffin about an alleged statement made by him about obtaining a job at the state's attorney's office.

On October 15, 2002, the defendant stated to the trial court that the defendant and the state had reached an agreement regarding the admissibility of the transcripts of the conversations between the confidential informant and Celeste. Thereafter, the materials were read to the jury. The materials indicated that Celeste had bragged repeatedly about killing the victim and had stated that the murder was a contract hit ordered by his uncle in Bridgeport. Celeste stated that the defendant wanted to help so that he could split the money. Celeste also told the informer that the defendant had been "called upon as a helper to get rid of the body" and that the defendant "helped get rid of the body, plain and simple."

Also on October 15, 2002, the state disclosed to the defendant a police report regarding a statement by one of Griffin's probationers, who was not identified, that he had heard that Celeste had bragged about killing the victim and that the murder had been ordered by Celeste's uncle in Bridgeport. The report had been provided to the state's attorney by Charles Mercer, a detective with the Old Saybrook police department, on the evening of October 14, 2002. The defendant again moved for a mistrial, which the court denied. The trial court ordered the state, however, to call Mercer on October 16, 2002, to testify whether the name of the unidentified probationer was attainable. Mercer testified, outside the presence of the jury, that he had met with Griffin and the unnamed probationer in October, 2000. Mercer further testified that he had not used the unnamed probationer's name in his report at the probationer's request and that he did not remember the probationer's name. The court denied the defendant's renewed motion for a mistrial finding that, because the probationer's knowledge of Celeste's bragging was third or fourth hand, the information in the report was so attenuated that it could have no material impact.

The defendant rested his case on the morning of October 23, 2002. During the lunch recess, the state disclosed to the defendant that it had just received evidence that, on Saturday, October 19, 2002, the state police had spoken with a confidential informant regarding a conversation that the informant had had with Celeste. The evidence consisted of notes taken by Frances Budwitz, Jr., a state police trooper, of an interview Budwitz had conducted with the confidential informant, Stuart Holly. When court reconvened after the lunch recess, the defendant moved for a mistrial. The court postponed closing arguments and ordered an evidentiary hearing to be held on October 25, 2002.

At the evidentiary hearing, Holly testified that, in 2001, he had informed Heiney that he had information about cocaine trafficking and Celeste. Heiney asked Holly to try to engage Celeste in a discussion of the murder. On one occasion, Holly asked Celeste if he had killed the victim. Holly testified that Celeste said, "I dotted his I's [and] crossed his T's . . . ." Holly understood this expression to mean that Celeste had shot the victim between the eyes. Celeste also told Holly that the defendant had stabbed the victim approximately twenty times with a knife after the victim was dead. Holly did not give this information to the police in 2001 because he thought Celeste was "full of crap." He went to the police on October 19, 2002, because he was aware that they were investigating the murder, although he was unaware of the defendant's trial. When Budwitz learned why Holly was there, he called Joseph Quilty, a sergeant with the state police. Quilty told Budwitz to call the Old Saybrook police department. Budwitz testified that Quilty called back after Holly had left the building, told Budwitz to take down the information and said that he would take care of it. Budwitz put his notes in Quilty's mailbox. Quilty did not find the notes

until the morning of Wednesday, October 23, 2002. He contacted the state's attorney at that time.

The trial court denied the defendant's motion for mistrial. The court permitted the defendant to reopen his case, however, and prohibited the state from putting on a rebuttal case. On the afternoon of October 28, 2002, the defendant called Quilty and Budwitz to testify before resting his case.

Thereafter, the jury returned a verdict of guilty on all counts and the court rendered judgments of conviction. This appeal followed. The defendant claims on appeal that he was deprived of his right to a fair trial by the state's untimely disclosure of: (1) the tapes, transcripts and police report pertaining to the conversations between Celeste and the confidential informant; (2) the records of the investigation into allegations of criminal misconduct by Griffin; (3) the police report concerning the interview with the unidentified probationer who had heard thirdhand accounts of statements made by Celeste; and (4) the notes and information regarding the statements made by Holly to Budwitz. The defendant also claims that the trial court improperly denied his motion to suppress a document seized from his person while he was in pretrial detention. We conclude that the state's untimely disclosure of these materials did not violate the defendant's constitutional right to a fair trial or to due process. We also conclude that the trial court properly denied the motion to suppress.

I

We first address the defendant's *Brady* claims. "We begin with the pertinent standard, outlined by *Brady* and its progeny, by which we determine whether the state's failure to disclose evidence has violated a defendant's constitutional rights. In *Brady* v. *Maryland,* supra, 373 U.S. 87, the United States Supreme Court held that the suppression by the prosecution of evidence

favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000). "The United States Supreme Court . . . in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), [held] that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Wilcox*, supra, 453–54.

"However, [e]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*." (Internal quotation marks omitted.) *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990). "Under such circumstances the defendant bears the burden of proving that he was prejudiced by the failure of the state to make [the] information available to him at an earlier time." Id., 126–27. "The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial." (Internal quotation marks omitted.) *State* v. *Daugaard*, 231 Conn. 195, 206, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995).

A

We first address the defendant's claim that he was deprived of his right to a fair trial by the state's failure to disclose the audio recordings and transcripts of wiretap conversations between a confidential informant and Celeste until September 27, 2002, and its failure to disclose the police report pertaining to those conversations until October 2, 2002. The defendant argues that the late disclosures prejudiced him by forcing him to reformulate his trial strategy at the eleventh hour. We conclude that the late disclosure of this evidence did not deprive the defendant of a fair trial.

First, the defendant does not explain how the late disclosures *forced* him to reformulate his trial strategy or, if it did, how this prejudiced him. Defense counsel argued to the trial court that he had intended to call the defendant to testify that Celeste had committed the murder. The disclosure of the materials did not *force* him to change that strategy, however; it merely made it unnecessary for him to take that risk. Thus, the disclosure of the materials did not cause the defendant to change his theory of defense, it merely provided an alternative and less risky means of proof.[7]

Second, the trial court granted a continuance to allow the defendant to review the materials and to attempt to locate Celeste. Ultimately, the defendant and the state agreed that portions of the materials should be given to the jury and they were admitted as evidence. The defendant has not explained how the inability to present this evidence at an earlier time affected the fairness of his trial. Accordingly, we conclude that the disclosures were not made "so late as to prevent the defendant from receiving a fair trial." (Internal quotation marks omitted.) Id.

---

[7] Clearly, if the disclosures had been made *after* the defendant had testified, our analysis would be quite different.

## B

The defendant also claims that the state's untimely disclosure of the records of an investigation into allegations of misconduct by Griffin deprived him of a fair trial. We disagree.

We recognize that "[i]t is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000). In support of his claim that the investigation materials were improperly suppressed impeachment evidence, however, the defendant does not argue that he was prejudiced by the late disclosure of the materials, which were available when he cross-examined Griffin. Rather, he argues that the state's attorney could not have made a good faith determination that the materials should be subject to a protective order. The constitutional policy underlying *Brady*, however, "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady* v. *Maryland*, supra, 373 U.S. 87. In the absence of any claim that the late disclosure of the materials resulted in an unfair trial, we conclude that the defendant cannot prevail on this claim.

## C

We next address the defendant's claim that he was deprived of his right to a fair trial by the state's untimely disclosure of the police report containing an unidentified probationer's statement that he had heard thirdhand accounts that Celeste had boasted about killing the victim. The trial court concluded that this information was too attenuated to have any impact on the outcome of the trial. On appeal, the defendant makes the bald assertion that the late disclosure of this material deprived him of a fair trial and offers no argument

or analysis to support this assertion. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004). Accordingly, we decline to review this claim.

## D

We next address the defendant's claim that the state's failure to produce the notes of Budwitz' interview with Holly until October 23, 2002, deprived him of a fair trial. Again, the defendant has not provided any argument or analysis as to how the timely production of this information, which did not come into the state's possession until October 19, 2002, would have affected the outcome of this trial. Accordingly, we decline to review the claim.

Although we have concluded that the defendant was not deprived of a fair trial by the state's failure to provide these items of evidence in a timely manner, we emphasize that we disapprove of this type of piecemeal production of exculpatory evidence by the state during trial and we strongly caution against it. As we have noted, however, the issue is not the state's culpability, but the effect of the late disclosure on the fairness of the trial. See *Brady* v. *Maryland*, supra, 373 U.S. 87. Because we have concluded that there is no reasonable probability that the late disclosures affected the outcome of the trial, we conclude that there was no *Brady* violation and the defendant is not entitled to a new trial.

## II

Finally, we address the defendant's claim that the trial court improperly denied the defendant's motion

to suppress a letter seized from his person while he was in the pretrial custody of the department of correction (department). He argues that the seizure was made after an improper warrantless search in violation of the fourth amendment to the United States constitution. We disagree.

The following additional facts are relevant to this claim. The defendant testified at the suppression hearing that he had been incarcerated before his arrest in the present case and that he was familiar with prison procedures for strip searches. He also testified that he was aware that his telephone calls in prison were recorded and monitored by the department. William Grady, the chief intelligence officer of the department, testified that strip searches routinely are performed on pretrial detainees charged with felonies when they are being transported to and from court appearances. He further testified that most escape attempts occur while the prisoner is being transported and that there is no difference in risk between convicted inmates and pretrial detainees.

On March 11, 2000, the department monitored a telephone conversation between the defendant and his sister. During the conversation, the defendant told his sister that he knew "a way to get around this whole thing, but [it would] take some work on [her] part." He asked her to sit in the front row of the courtroom during his next court hearing so that he could pass her a note. The correction officer who had monitored the call notified his superior who, in turn, requested that Jeffrey Herboldt, another correction officer, conduct a strip search of the defendant before his next court appearance on March 14, 2000. When Herboldt conducted the search, he found the note, folded into a small square, in the defendant's shirt pocket. The note read: "If we can [find] someone that is [terminally] ill with cancer or [AIDS] or something like that, that will take the blame

in trade of us [taking] care of them while they are alive and paying off [their] family . . . for a set amount we can make this problem [disappear]. All we have to do is [corroborate] stories. Maybe you know someone or maybe you can [find] someone in a hospital? I know it sounds crazy and a long shot but it is a shot. [I'll] understand if you don't want to do it." The correction officer confiscated the note, which was introduced at trial as evidence of consciousness of guilt.

We begin with the applicable standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . None of the trial court's factual findings is in dispute. Because these issues raise questions of law, our review is plenary." (Citation omitted; internal quotation marks omitted.) *State* v. *Lasaga*, 269 Conn. 454, 463, 848 A.2d 1149 (2004).

"To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the [subject of the search]. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether the defendant had a reasonable expectation of privacy in the [subject of the search] requires a two part factual inquiry: first, whether the defendant has exhibited an actual subjective expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." (Internal quotation marks omitted.) *State* v. *Russo*, 259 Conn. 436, 441 n.7, 790

A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002).

The United States Supreme Court has recognized that, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. . . . The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. . . . There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. . . . This principle applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." (Citations omitted; internal quotation marks omitted.) *Bell* v. *Wolfish*, 441 U.S. 520, 545–46, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). "[S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and . . . accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson* v. *Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in

institutional security. We believe that it is accepted by our society that [l]oss of freedom of choice and privacy are inherent incidents of confinement." (Internal quotation marks omitted.) Id., 527–28. This court has recognized that, under both the federal and state constitutions, "[t]he inmates of Connecticut's correctional institutions . . . have no reasonable expectation of privacy in their nonprivileged telephone calls and those calls may be monitored and recorded." *Washington* v. *Meachum*, 238 Conn. 692, 725, 680 A.2d 262 (1996).

Applying the foregoing principles to the facts of the present case, we conclude that the defendant had no reasonable expectation of privacy in the note. The department has an important security interest in searching prisoners before transporting them to and from court appearances and the defendant was or reasonably should have been aware of that practice. Accordingly, the department was not required to obtain a warrant for the search.

The defendant argues, however, that the search was unconstitutional because: (1) restrictions on a prisoner's mail must serve an important governmental interest and the restriction must be no greater than necessary; (2) as a pretrial detainee, he is not subject to the same intrusions on his privacy as a sentenced prisoner; and (3) even if the seizure of the note was constitutional, its use in the criminal proceeding was not. We are not persuaded.

First, the cases cited by the defendant in support of his argument that restrictions on outgoing mail must "further an important or substantial governmental interest unrelated to the suppression of expression . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved"; *Procunier* v. *Martinez*, 416 U.S. 396, 413, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974); is inapposite because

the note was not mail, but was found concealed on the defendant's person, in apparent violation of department policy, immediately before he was scheduled to be transported to court. Thus, the department had a security interest in seizing the note regardless of its content.[8] Moreover, even if the note were considered to be mail, its seizure furthered a substantial government interest because the department had reason to believe that the note might involve future criminal activity, such as witness tampering or an escape attempt.

Second, the defendant has cited no authority in support of his argument that the government's interest in institutional security and internal order warrants a reduced expectation of privacy only when the subject of the search is a convicted prisoner, not when he is a pretrial detainee. *Bell* v. *Wolfish*, supra, 441 U.S. 545, clearly indicates otherwise.

Finally, the defendant has cited no authority for the proposition that, even though the department was not required to obtain a warrant to seize the note for security purposes, it was required to obtain a warrant to seize the note for the purpose of introducing it at trial. Because the defendant had no expectation of privacy vis-á-vis prison officials, he had no expectation of privacy vis-á-vis the state's attorney. Cf. *United States* v. *Jacobsen*, 466 U.S. 109, 117, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("[o]nce frustration of the original expectation of privacy occurs, the [f]ourth [a]mendment does not prohibit governmental use of the now nonprivate information"). Accordingly, we reject this claim.

The judgments are affirmed.

In this opinion the other justices concurred.

---

[8] The department had a legitimate interest, for example, in ensuring that the defendant did not have unauthorized physical contact with other persons while in the courtroom. The department might also have a legitimate concern that the defendant could use the paper to jam a lock.