STATE OF CONNECTICUT *v.* KURTULUS KALICAN
(AC 28140)

Flynn, C. J., and Robinson and Peters, Js.

744

Argued May 27—officially released October 7, 2008

*Joseph Visone,* special public defender, for the appellant (defendant).

*Theresa Anne Ferryman,* senior assistant state's attorney, with whom were *Paul J. Narducci,* senior

assistant state's attorney, and, on the brief, *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Kurtulus Kalican, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a, attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 and criminal violation of a protective order in violation of General Statutes § 53a-223. On appeal, the defendant claims that the court improperly (1) denied his motion to suppress a statement he made to the police, (2) admitted into evidence a document he wrote during his pretrial detention, (3) denied his claim that the state, during jury selection, exercised a peremptory challenge in a racially discriminatory manner and (4) failed to instruct the jury with respect to a photograph that had been admitted into evidence. We do not agree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and Ayfer Kaya were married on August 31, 1990, and had three children. Kaya initiated a divorce action in May or June, 2002. The court rendered a judgment of dissolution in January, 2003. Following the divorce, the defendant retained a key to the former marital home, located at 86 Blackhall Street in New London, and would stay there when visiting the children. The defendant was employed in New Jersey, and he stayed there with his brother, Guner Kalican during the week.

After the divorce, Kaya became romantically involved with David Romero. At approximately 10:30 p.m. on

September 21, 2003, Romero arrived at 86 Blackhall Street to spend time with Kaya. Romero and Kaya decided that he would stay overnight. The defendant telephoned Kaya and learned that Romero was in the former marital home. The defendant drove from New Jersey to New London. Upon his arrival, the defendant retrieved a revolver that he had stored in the basement of the home and then proceeded upstairs to the bedroom.

Kaya heard the bedroom door open and saw the defendant, who then turned on the lights and started firing the revolver. The defendant shot Romero and began to struggle with him. The defendant then shot Kaya in the leg, shot Romero a second time and then returned his attention to Kaya, shooting her in the chest. He pointed the revolver at her head and continued to pull the trigger but had exhausted his supply of ammunition. He then struck her in the head and mouth with the revolver. The defendant then departed in a red Chevy Tahoe.

During the struggle, Kaya successfully had dialed 911, and New London police officers were dispatched to the scene. Kaya informed the officers that the defendant had shot her and Romero, and that the defendant drove a red Chevy Tahoe. This information was used to apprehend the defendant on Interstate 95. Romero died as a result of his gunshot wounds. Kaya recovered from her serious physical injuries after receiving medical treatment.

The state, in a substitute information, charged the defendant with the murder of Romero, in violation of General Statutes § 53a-54a, the attempted murder of Kaya, the first degree assault of Kaya, carrying a pistol or revolver without a permit and criminal violation of a protective order. The jury found the defendant not guilty of murder with respect to Romero but found him

guilty of the lesser included offense of manslaughter in the first degree with a firearm. The jury also found him guilty of the remaining charges. The court sentenced the defendant to sixty-four years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress an incriminatory statement he made to the police. Specifically, he argues that he was subjected to a custodial interrogation while on Interstate 95 and that the court improperly found that he validly had waived his *Miranda* rights.[1] We conclude that the court properly determined that the defendant validly waived his *Miranda* rights, and, therefore, the defendant's claim must fail.

The following additional facts are necessary for our discussion. On August 9, 2004, the defendant filed a motion to suppress certain statements as well as any evidence obtained therefrom. The court held a hearing on May 2, 2006, with respect to this motion. Timothy Marely, a Stonington police officer, testified that during the early morning hours of September 22, 2003, he had been instructed to "be on the lookout" for a suspect operating a red Chevy Tahoe. After observing such a vehicle on Interstate 95, he effectuated a traffic stop and requested the presence of an additional officer. He then conducted a felony stop, which consisted of using the police vehicle's public address system to instruct the defendant to shut off his Tahoe's engine, exit the Tahoe, walk backward to the officers and lie face down on the ground with his hands out. The defendant complied with these instructions and was handcuffed and secured in the back of the police vehicle.

---

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Michael Strecker, a New London police sergeant, and Robert L. Kanaitis, a New London police officer, were directed to depart from 86 Blackhall Street and proceed to Interstate 95 where Stonington police officers had detained the defendant. Kanaitis informed the defendant that he was under arrest on a charge of assault in the first degree and transferred him to a New London police vehicle. Kanaitis then read the defendant his *Miranda* rights. The defendant, who was handcuffed, indicated that he understood these rights by nodding up and down, as well as by stating that he understood his rights. Kanaitis further indicated to the defendant that the police officers would "work with [him]."

After the defendant had been advised of his *Miranda* rights, Kanaitis inquired as to the location of the revolver. The officers expressed concern for public safety with respect to the firearm. The defendant told Kanaitis and Strecker that the weapon was located four buildings down from 86 Blackhall Street, near Connecticut Avenue. This information was relayed to officers at the crime scene, who retrieved the revolver.

At some point, the defendant tapped his head against the window of the police vehicle. Kanaitis walked over to the vehicle and opened the door. At the hearing, Kanaitis testified that the defendant inquired, "how much am I gonna get for this?" and Kanaitis responded that that was "up to the courts." Kanaitis and Strecker then transported the defendant to the New London police station. Kanaitis stated that at the station, while the defendant was being processed, he again read the defendant his *Miranda* rights. The defendant refused to sign a "notice of rights" form.

As the officers prepared to take a statement from the defendant, Kanaitis left to obtain an audiotape recorder. Upon Kanaitis' return, the defendant again was given *Miranda* warnings, and he invoked the right to speak

with an attorney. At this point, the interview of the defendant concluded.

At the conclusion of the hearing, the court orally denied the defendant's motion to suppress. The court found that the defendant demonstrated a sufficient understanding of the English language. The court further found that the defendant's will had not been overcome and that he voluntarily waived his *Miranda* rights when he spoke with the officers.

On appeal, the defendant claims that he was subjected to a custodial interrogation beginning with Kanaitis' statement that the police officers would "work with [him]."[2] According to the defendant, this statement was the equivalent of " 'we will help you if you cooperate with us.' " He further maintains that he did not waive his *Miranda* rights, and, therefore, his statements on Interstate 95 should have been suppressed.

In response, the state argues first that the statement of the defendant, "how much am I gonna get for this?" was spontaneous and not the result of police interrogation. It further claims, in the alternative, that if the dialogue on Interstate 95 constituted an interrogation, the court properly found that the defendant had been advised of and had waived his *Miranda* rights. Finally, the state contends that any impropriety was harmless beyond a reasonable doubt. For the purposes of our analysis, we assume, without deciding, that the defendant's exchange with the officers on Interstate 95 constituted a custodial interrogation. We conclude, however, that the court properly determined that the defendant validly waived his *Miranda* rights.

As an initial matter, we set forth the applicable standard of review. "On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in

---

[2] The parties agree that the defendant was in custody at this time.

connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. . . . [W]e engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence . . . . We give great deference to the findings of the trial court because it weighs the evidence before it and assesses the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Linarte*, 107 Conn. App. 93, 98, 944 A.2d 369, cert. denied, 289 Conn. 901, 957 A.2d 873 (2008); see also *State* v. *Trine*, 236 Conn. 216, 225, 673 A.2d 1098 (1996).

We now turn to the legal principles germane to the defendant's claim. "[T]o show that the defendant waived his privilege against self-incrimination, the state must prove by a preponderance of the evidence that he knowingly and intelligently waived his constitutional right to remain silent. . . . The question is not one of form, but rather whether the defendant . . . knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . [T]he question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . The issue of waiver is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Linarte*, supra, 107 Conn. App. 99; see also *State* v. *Jones*, 281 Conn. 613, 654, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

We have stated: "[A]n express written or oral statement of waiver of the right to remain silent or of the

right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." (Internal quotation marks omitted.) *State* v. *Stephenson*, 99 Conn. App. 591, 600, 915 A.2d 327, cert. denied, 282 Conn. 903, 919 A.2d 1037 (2007). "Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 51, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "Some of the factors that are used to determine whether a defendant impliedly waived his rights are (1) whether the defendant understood his rights, (2) the defendant's willingness to speak, (3) whether the defendant expressed any desire to remain silent, (4) whether the defendant's answers were in a narrative form rather than monosyllabic responses, (5) whether there are any facts that cast doubt on the voluntariness of the waiver and (6) whether the defendant subsequently exercises his *Miranda* rights." *State* v. *Stephenson*, supra, 600. We conclude that there was evidence in the record to support the court's finding of waiver by the defendant.

The court found that the defendant, although a native of Turkey, demonstrated "a complete understanding of the [spoken English] language."[3] There was evidence that the defendant followed the instructions given to him during the felony stop. Both Strecker and Kanaitis testified that the defendant acknowledged that he understood his rights.[4] Specifically, the defendant nodded affirmatively and verbally indicated that he understood his rights. The defendant informed the officers where he had thrown the revolver.

---

[3] The defendant indicated that he could not read or write English.

[4] The court rejected any claim of intoxication by the defendant. The defendant had testified that he had consumed alcohol during his drive from New Jersey to New London.

There also was evidence before the court at the suppression hearing that the defendant had a recent encounter with the police. James Suarez, a New London police officer, testified that on August 21, 2003, approximately one month before the assaults of Kaya and Romero, he had arrested the defendant and read him the *Miranda* rights during the booking process. At that time, the defendant refused to sign the notice of rights form. The defendant, therefore, had a prior encounter with the police and was familiar with the *Miranda* warnings.

Finally, although the defendant spoke with the officer while in custody on Interstate 95, he invoked his right to counsel at the police station. Specifically, when Kanaitis returned to begin recording the defendant's statement, he requested an attorney. Our Supreme Court has observed that "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. . . . [W]e have held that the assertion of the right to remain silent after an initial willingness to speak with police is a strong indication that the defendant understood his rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 78, 621 A.2d 728 (1993).

We therefore conclude that the state has met its burden of proving, in light of the totality of the circumstances, that the defendant's waiver of his *Miranda* rights was knowing, intelligent and voluntary and that the court properly denied the defendant's motion to suppress.

II

The defendant next claims that the court improperly admitted into evidence a document he wrote during his pretrial detention. Specifically, he claims that admission

of this document violated his federal and state constitutional rights against unreasonable search and seizures.[5] We conclude that the record is inadequate to review this claim.

The following additional facts are necessary for our discussion. During cross-examination of the defendant, the state sought to introduce a document he had written. Outside the presence of the jury, the defendant testified that in September, 2004, he was held as a pretrial detainee at a correctional facility. During this time, the defendant wrote a document. The state called this document a "letter to his children," and the defendant described it as a "diary note."[6]

Defense counsel conducted voir dire and asked the defendant how the state obtained the document. The defendant replied that he did not know, but he thought that it had been taken from his cell. He acknowledged that the document was in his writing and testified that he had never attempted to send it to anyone. At this point, defense counsel raised a relevance objection. Specifically, he argued that the prejudicial effect outweighed any probative value of the document.

The court then, sua sponte, raised the issue of whether the defendant had a privacy interest in the document. The prosecutor responded that our Supreme Court, in *State* v. *Pink*, 274 Conn. 241, 875 A.2d 447 (2005), had concluded that prisoners have a limited

---

[5] Although the defendant mentioned article first, § 8, of the Connecticut constitution, he has failed to brief its applicability under the circumstances of this case. We therefore do not consider his state constitutional claim. See *State* v. *Strich*, 99 Conn. App. 611, 626 n.17, 915 A.2d 891, cert. denied, 282 Conn. 907, 920 A.2d 310, cert. denied, 552 U.S. 901, 128 S. Ct. 225, 169 L. Ed. 2d 171 (2007); see also *State* v. *T.R.D.*, 286 Conn. 191, 199 n.10, 944 A.2d 288 (2008).

[6] The opening paragraph of the document states in relevant part: "9-22-04. Exactly one year behind bars. Worses year in my life. I don't even now how many more. First year without my family. *I miss you guys so much. I dream you guys. I am thinking of you guys.*" (Emphasis added.)

expectation of privacy. The prosecutor then addressed the objection raised by the defendant. The court overruled the defendant's relevance objection.

The jury returned, and the prosecutor subsequently introduced the document into evidence. At that time, defense counsel noted: "My objection is on the record, Your Honor, for the reasons stated on the record. This was his diary or his writing."[7] The state then questioned the defendant about the contents of the document. During this examination, defense counsel did not raise any objections to the questions posed by the prosecutor.

On appeal, the defendant does not challenge the court's ruling on his evidentiary objection that the probative value of the document outweighed its prejudicial impact. Instead, he argues that the present case is factually distinguishable from *State* v. *Pink*, supra, 274 Conn. 241, and that he had a reasonable expectation of privacy in the document.[8] He further contends that the state failed to offer a legitimate security concern that required the correctional staff to seize the document. In response, the state first notes that the defendant failed to set forth a standard of review in his brief or to request review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). It further claims that the defendant failed to pursue a fourth amendment objection. As a result, the state contends that the record is inadequate to review such a claim. We agree.

---

[7] The defendant does not argue that his statement that "[t]his was his diary" was sufficient to inform the court and the state that he was presenting a fourth amendment objection during trial.

[8] "In order to challenge a search or seizure on fourth amendment grounds, a defendant must show that he has a reasonable expectation of privacy in the place searched. . . . An individual has a reasonable expectation of privacy if he subjectively believes that the area will remain private, and his subjective belief is one that society is willing to recognize as reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Thomas*, 98 Conn. App. 542, 550, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007); see also *State* v. *Gonzalez*, 278 Conn. 341, 348–49, 898 A.2d 149 (2006).

As the appellant, the defendant bore the burden of providing this court with a record adequate for review of his claim. *State* v. *Hannah*, 104 Conn. App. 710, 714, 935 A.2d 645 (2007), cert. denied, 285 Conn. 916, 943 A.2d 475 (2008); see also Practice Book § 61-10. He has failed to do so. There are no findings regarding seizure of the letter from the correctional facility. As pointed out in the state's brief, "[t]he record is entirely silent as to the circumstances of the state's access to the document." Thus, we are unable, as a result of the inadequate record, to consider whether the defendant had a reasonable expectation of privacy in the document.[9] See, e.g., *State* v. *Thompson*, 46 Conn. App. 791, 795–96, 700 A.2d 1198 (1997).

"This court's role is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court. . . . [Otherwise], we are left to guess or speculate as to the existence of a factual predicate." (Internal quotation marks omitted.) *State* v. *Bermudez*, 95 Conn. App. 577, 585, 897 A.2d 661 (2006). In the absence of pertinent factual findings, a record is rendered inadequate. *State* v. *Sargent*, 87 Conn. App. 24, 30, 864 A.2d 20, cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005); see also *State* v. *Jenkins*, 104 Conn. App. 417, 440, 934 A.2d 281 (2007) (*Schaller, J.*, dissenting), cert. granted on other grounds, 285 Conn. 909, 940 A.2d 809 (2008). We conclude that in the absence of the pertinent facts relating to the defendant's claim,

[9] We note that "[t]he burden of proving the existence of a reasonable expectation of privacy rests on the defendant. . . . In order for the defendant to demonstrate that he had a reasonable expectation of privacy in the [subject of the search]: (1) he must have manifested a subjective expectation of privacy with respect to the [subject of the search]; and (2) that expectation must be one that society would consider reasonable. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications." (Citation omitted; internal quotation marks omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 583, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008).

we are unable to afford it review and to consider its merits.

## III

The defendant next claims that the court improperly denied his claim that the state, during jury selection, exercised a peremptory challenge in a racially discriminatory manner. Specifically, he argues that the prosecutor improperly struck M,[10] an African-American male, depriving him of a fair trial in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We are not persuaded.

Before addressing the specifics of the defendant's claim, we set forth the legal principles that guide our analysis. "In *Batson* [v. *Kentucky*, supra, 476 U.S. 79], the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual.

---

[10] We use the initial of the venireperson to protect his legitimate privacy interests. See *State* v. *Peeler*, 267 Conn. 611, 620 n.9, 841 A.2d 181 (2004).

. . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State*

v. *Hamlett,* 105 Conn. App. 862, 876–78, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008); see also *State* v. *Holloway,* 209 Conn. 636, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

M indicated to the court that he knew some of the attorneys and some of the police officers associated with this case. During voir dire, the prosecutor inquired whether M or any member of his family had been involved with the criminal justice system. M responded in the affirmative, stating that his home had been broken into and that members of his family had been assaulted. M then stated that he had not been satisfied with the work that the police had done. "Basically . . . I thought they were slow . . . kind of slow to react. I think they came with an attitude that, you know, this happens, you're probably not—in fact, that's what they told me. You're probably not gonna get nothing back." M further revealed that while he had a more positive experience with the Norwich police department, the actions of the New London police had left him with an "unfortunate impression" of their conduct.

M later stated that he had family members who were victims of crimes and that some family members had been convicted or accused of criminal activity. In his experience, some individuals had received treatment that was too lenient while others had been treated too harshly. At the conclusion of defense counsel's inquiry, the prosecutor exercised a peremptory challenge. Defense counsel raised a *Batson* challenge on the ground that M had been the sole African-American in the venire panel.[11]

In response to the *Batson* challenge, the prosecutor indicated the reasons for the use of the peremptory

[11] The court subsequently stated: "And I assume we agree that [M] is African-American. For the record, agree?" The prosecutor responded: "Agreed, Your Honor."

challenge. He stated that M had indicated that he had previously had a negative experience with the New London police. Additionally, M had various family members who had been defendants in criminal proceedings. On the basis of these race neutral reasons,[12] the prosecutor exercised the peremptory challenge.

"Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government. We decline to ascribe a racial animus to the state's excusal of a venireperson with an arrest record simply because that venireperson was black. We agree with courts in other jurisdictions that this concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Jackson*, 95 Conn. App. 400, 407, 896 A.2d 137, cert. denied, 279 Conn. 904, 901 A.2d 1226 (2006); *State* v. *Jackson*, 73 Conn. App. 338, 348, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). Furthermore, our Supreme Court has stated that "[c]ourts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against the prosecuting authorities generally." *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *State* v. *Morales*, 71 Conn. App. 790, 804–805, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

[12] "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 324, 630 A.2d 593 (1993).

In the present case, M had a negative experience with the New London police department. Officers from this department would be called as witnesses by the state. Furthermore, M has relatives who have been subjected to criminal prosecution. We conclude that the court properly determined that the prosecutor had provided race neutral reasons for exercising a peremptory challenge with respect to M.

The defendant further argues that M's responses during voir dire, when considered in their entirety, did not support the prosecutor's reasons for exercising a peremptory challenge. Specifically, he refers to M's statement that he would not allow his personal knowledge of police officers to interfere with his credibility determination and that he was able to decide the issue of the defendant's guilt or innocence on the basis of the evidence presented in the court. The defendant also focuses on M's response that despite his experience with the New London police department, M would not be prejudiced against the New London police officers or their testimony. Finally, the defendant notes that M stated that he thought that "as a person, as an individual, I'm fair and impartial . . . ."

After the prosecutor provided race neutral reasons for exercising a preemptory challenge, it was the defendant's burden to persuade the court that those reasons were insufficient or pretextual. See *State* v. *Jackson,* supra, 73 Conn. App. 348. We conclude that the defendant failed to meet that burden. "The state . . . is not required to rely on a venireperson's assurance that he will be impartial. [A] prosecutor is not bound to accept the venireperson's reassurances, but, rather is entitled to rely on his or her own experience, judgment and intuition in such matters." (Internal quotation marks omitted.) Id., 348–49; *State* v. *Morales,* supra, 71 Conn.

App. 807. We conclude that the court properly determined that the state had not exercised its peremptory challenge in a racially discriminatory manner.

## IV

The defendant's final claim is that the court improperly failed to instruct the jury with respect to a photograph that had been admitted into evidence. Specifically, he claims that the court should have instructed the jury, sua sponte, that it should not speculate about an unidentified firearm contained in a photograph introduced by defense counsel. The defendant further contends that by failing to instruct the jury in such a manner, his credibility was impeached. We decline to review this unpreserved evidentiary claim.

The following additional facts are necessary for our discussion. On May 24, 2006, during its deliberations, the jury sent a note to the court, listing several requests. One of those requests pertained to defense exhibit X, and the jury requested that the court "explain [an] item that appears to look like a gun . . . ." Defense exhibit X was a photograph of the crime scene in which a firearm appeared to be present in the bottom of the photograph, approximately halfway between the center and the left corner.

In response to the jury's inquiry, the court placed the following statement on the record. "Number three, 'defense exhibit X, explain [an] item that appears to look like a gun.' We had informal discussions about that, and the state says it's a toy gun but it doesn't matter, and I can't even say to the jury [that] they're not to speculate; it's an exhibit that is evidence in the trial, so I'm just going to say [that] we are not going to comment about it, and they're going to love that." Both the prosecutor and defense counsel expressly stated that there was no objection. The next day, the court

informed the jury that exhibit X was substantive evidence and that the court could not comment beyond that. Neither party raised an objection.

On appeal, the defendant claims that exhibit X impeached his credibility. The defendant had testified that after the shooting incident, he exited the home. While outside, he realized that he was carrying the revolver and threw it away. He contends, therefore, that the presence of a firearm in the photograph contradicted his testimony and therefore impeached his credibility before the jury.

The defendant concedes that his claim is unpreserved and requests review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. "Under *Golding*, a defendant may prevail on unpreserved claims only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail. . . . In the absence of any one of the four *Golding* conditions, the defendant's claim will fail. . . . The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Hazel*, 106 Conn. App. 213, 218–19, 941 A.2d 378, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

At the outset, we note that the defendant has not provided us with any analysis or case citation setting

forth how his claim is of constitutional magnitude. Instead, he argues that the jury was not instructed adequately and that the jury was forced to speculate as to the presence of a firearm in exhibit X. As a result, the defendant claims that his credibility was impeached improperly.

We have stated that our Supreme Court "previously has recognized that an instructional error relating to general principles of witness credibility is not constitutional in nature. *State* v. *Patterson*, 276 Conn. 452, 471, 886 A.2d 777 (2005); *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997)." (Internal quotation marks omitted.) *State* v. *Bazemore*, 107 Conn. App. 441, 450, 945 A.2d 987, cert. denied, 287 Conn. 923, 951 A.2d 573 (2008). "Indeed, it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party or because of a strained connection between it and a fundamental constitutional right." (Internal quotation marks omitted.) *State* v. *LaBrec*, 270 Conn. 548, 557, 854 A.2d 1 (2004). As the defendant has failed to demonstrate that his claim is of constitutional magnitude, it therefore fails to satisfy the second prong of *Golding*, and we decline to afford it review.

The judgment is affirmed.

In this opinion the other judges concurred.