******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* ORLANDO F.*
## (AC 46830)

Moll, Seeley and Prescott, Js.

*Syllabus*

Convicted, after a jury trial, of robbery in the first degree and other crimes, the defendant appealed. He claimed, inter alia, that the trial court improperly admitted into evidence, pursuant to *State* v. *Gore* (342 Conn. 129), testimony by B, a nonpercipient witness, identifying him from surveillance video footage she was shown in the courtroom during the trial. *Held*:

This court declined to review the defendant's argument that the trial court should have considered that the manner in which B was shown the video was suggestive because it was the first time she had seen the footage, there having been nothing in the record to establish when B had first viewed the video evidence.

This court was not persuaded that the circumstances of the defendant's case warranted the trial court's consideration of B's purported bias against him and that the admission of her testimony would result in an undue restriction of the defendant's constitutional right to confront B, as those matters, which pertained to trial tactics and the weight to be accorded to her testimony, were beyond *Gore*'s requirement that, in determining whether a witness is more likely to correctly identify the defendant than is a jury, the trial court should consider factors pertaining to the witness' familiarity with the defendant and his appearance, as well as the video's quality and the extent to which it depicts the defendant.

The trial court did not abuse its discretion in admitting B's identification testimony, which was more probative than it was prejudicial in light of her past history and familiarity with the defendant, with whom she had two children, and the defendant provided no authority to show that B's testimony was rendered unduly prejudicial because his counsel might have had to inquire into prior domestic violence between B and the defendant to be able to fully establish her bias against him.

Even if this court were to assume that the admission of B's identification testimony was improper, the defendant did not establish that he was harmed by the trial court's failure to preclude that testimony, as the state presented a strong case against the defendant that included DNA evidence, surveillance

---

* In accordance with our policy of protecting the privacy interests of the victims of domestic violence, we decline to identify the defendant or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e; see also footnote 9 of this opinion.

video footage, and testimony from the victim and B, and defense counsel was permitted unfettered cross-examination of B.

The defendant could not establish that the trial court committed plain error by failing to instruct the jury about how to use B's identification testimony, as *Gore* does not require trial courts to instruct juries concerning nonpercipient witnesses.

Argued February 4—officially released June 3, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of attempt to commit robbery in the first degree, larceny in the third degree, robbery in the first degree, assault in the second degree and reckless endangerment in the first degree, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *Oliver, J.*; thereafter, the court denied the defendant's motion to preclude certain evidence; verdict and judgment of guilty of attempt to commit robbery in the first degree, robbery in the first degree and reckless endangerment in the first degree, and sentence enhanced for the commission of robbery involving an occupied motor vehicle, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Alexander A. Kambanis*, deputy assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Steven M. Lesko*, assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Orlando F., appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (3), robbery in the first degree in violation of § 53a-134 (a) (3) and reckless endangerment in the first

degree in violation of General Statutes § 53a-63. On appeal, the defendant claims that the trial court improperly (1) admitted into evidence testimony by a lay witness who identified him from a surveillance video recording during trial and (2) committed plain error by improperly instructing the jury about that witness' identification. We disagree and, accordingly, affirm the judgment of the court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On the evening of July 25, 2020, the victim and the defendant used a dating application called Grindr[1] to plan to meet for a sexual encounter. The two men had not interacted previously through the dating application, and the defendant used the false name of "John" while interacting with the victim. They initially agreed that the victim would use his car to pick up the defendant on Main Street in Cromwell; however, the defendant sent the victim a text message while he was on the way, asking, instead, to be picked up on New Lane Street in Cromwell.[2] When the victim arrived at New Lane Street in the early morning of July 26, 2020, the defendant approached the victim's vehicle, entered it, and sat in the passenger seat.[3]

The victim and the defendant engaged in "normal conversation" for about twenty to thirty seconds as the

---

[1] Grindr "is a web-based dating application . . . for gay and bi-sexual men." *Herrick* v. *Grindr, LLC*, 306 F. Supp. 3d 579, 584 (S.D.N.Y. 2018), aff'd, 765 Fed. Appx. 586 (2d Cir.), cert. denied,      U.S.     , 140 S. Ct. 221, 205 L. Ed. 2d 135 (2019).

[2] The jury reasonably could have found that the defendant resided on Main Street in Cromwell at the time of the crime.

[3] The defendant's profile on Grindr did not contain photographs. The defendant, however, did send the victim a photograph of himself. On the basis of that photograph and the victim's observation of the defendant when he entered the victim's car, the victim described the defendant as a light-skinned Hispanic male, who was bald with wide eyes and olive skin and wore a track suit.

victim drove toward an intersection. When the victim turned right at the intersection, the defendant held a kitchen knife to the victim's face and instructed him to drive to a bank. The victim, worried because he did not have money in the bank, told the defendant that he was between jobs, after which the defendant instructed him to drive to the highway. The victim continued driving and offered the defendant his cell phone. When he handed his cell phone to the defendant, the victim tried to disarm the defendant by grabbing the blade of the knife, at which point he dropped his phone. Thereafter, the victim stopped the car, opened the driver's side door, and fled, screaming for help. When he turned around to see if the defendant was chasing him, he saw that the defendant had gotten into the driver's seat of the car. The victim, who did not want the defendant to steal his car, went back toward the car and tried to open the rear driver's side door, which was locked. He then opened the driver's side door and attempted to pull the defendant out of the vehicle, but the defendant proceeded to drive away while the victim was holding onto the car.[4] The victim continued trying to pull the defendant out of the car; however, the defendant subsequently bit the victim's right forearm and accelerated the vehicle, which caused the victim to let go of the car and fall into the street, landing on the road.

The victim thereafter stood up, noticed that he was covered in blood and missing a shoe, and saw the defendant drive away in his vehicle. While yelling for help, the victim ran down the street to a gas station and asked the clerk to call the police. When officers from the Cromwell Police Department arrived at the gas station, they observed the victim as being upset and having

---

[4] Specifically, the victim testified that he was between the open driver's side door and the driver's seat of the car, with one hand on top of the car, one hand holding onto the open door, one foot inside of the car, and one foot hanging out of the car.

ripped clothing, one shoe, a lacerated right hand, and multiple scrapes. The victim told the officers that his car had been stolen by a person who tried to stab him and that he had been thrown out of the moving vehicle. He also provided them with a description of the perpetrator. Paramedics arrived and treated the victim at the scene before transporting him by ambulance to a hospital.[5]

Shortly afterward, the detective assigned to the case, Elizabeth Jones, interviewed the victim at the hospital. While there, she swabbed the bite wound on the victim's forearm for DNA and took a buccal swab from the interior of the victim's mouth. The swabs were sent for DNA testing at the state forensic laboratory. Subsequently, Jones obtained surveillance video footage from a residential security camera on New Lane Street (New Lane Street video footage) that showed the victim picking up a bald man wearing a tank top and shorts on July 26, 2020.[6] After the victim's stolen vehicle was found on Campfield Avenue in Hartford on July 27, 2020, Jones swabbed the interior of the vehicle for DNA evidence. During her investigation, Jones viewed surveillance video footage from a residential security camera near where the victim's vehicle was found, which showed the vehicle being left at that location on July 26, 2020, by a bald man with a clearly visible chest

---

[5] At trial, the victim testified that he suffered several injuries during the incident, including "third degree road burn on [his] sides . . . rear . . . leg . . . calf . . . and on [his] hand"; "a gash [to his] head"; "a knife cut in [his] hand"; and a bite wound to his right forearm. Photographs of his injuries were admitted into evidence.

[6] More specifically, the New Lane Street video footage consists of three videos taken from residential security cameras positioned at different angles toward New Lane Street. The videos show a bald man, who was wearing a tank top and shorts and walking on New Lane Street at night, step out into the road in front of an approaching sedan. After the vehicle stops, the man enters it through the passenger side, and the vehicle drives away.

tattoo who was wearing a tank top and shorts (Campfield Avenue video footage).[7] Upon being shown the video footage, Jones recorded it on her police department issued cell phone. After the police identified the defendant as a suspect, they obtained and executed a search warrant for the defendant's "saliva secretions and buccal cell samples . . . for the purpose of DNA identification and comparison . . . ." The police also obtained a search warrant for the contents of the defendant's cell phone, which they had seized when executing the warrant to obtain the DNA samples.

At the state forensic laboratory, the sample taken from the victim's bite wound tested positive for amylase, a component of saliva. An extraction from the sample collected from the victim's bite wound yielded a DNA profile that contained a mixture from two males and included the defendant's DNA profile. A forensic examiner concluded from the DNA analysis, after assuming that the victim was one of the two contributors, that the DNA profile was at least 100 billion times more likely to occur if it came from the defendant and the victim, rather than from the victim and another unknown individual, and that the mixture contained more of the defendant's DNA profile than it did the victim's.[8] Moreover, an analysis of the contents of the

_____

[7] In particular, the Campfield Avenue video footage consists of cell phone recordings of three videos playing on a computer screen, which were taken by residential security cameras positioned at different angles toward Campfield Avenue. The videos show what appears to be the same sedan depicted on the New Lane Street video footage coming to a stop at a well lit area on Campfield Avenue on July 26, 2020, at which point a bald man wearing a tank top and shorts, with a clearly visible chest tattoo, begins to wipe down the steering wheel and other areas of the vehicle's interior, before exiting the vehicle and walking on the sidewalk until he is out of view. From a different angle, the same man then can be seen pacing for a time in the yard of the residence where the cameras were located and on the sidewalk.

[8] In addition, extractions from the swabs collected from the inside of the victim's vehicle, namely, on the driver's side door handle and steering wheel, yielded DNA profiles containing mixtures of three and five persons, respectively. The defendant's DNA profile could not be eliminated as a contributor

defendant's cell phone revealed that he had not made or received any phone calls between 1:30 and 3:30 a.m. on July 26, 2020, during which time the victim was attacked and his car was stolen, although an "excess" of calls had been made from or received by the defendant's cell phone before and after that time frame.

The defendant was arrested and subsequently charged in an amended long form information with attempt to commit robbery in the first degree in violation of §§ 53a-49 (a) (2) and 53a-134 (a) (3), larceny in the third degree in violation of General Statutes § 53a-124 (a) (1), robbery in the first degree in violation of § 53a-134 (a) (3), assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and reckless endangerment in the first degree in violation of § 53a-63.

Prior to the commencement of a jury trial in this case, the state disclosed its intention to call as a witness B, a former romantic partner of the defendant and the mother of two of his children.[9] On January 17, 2023, the defendant filed a motion in limine in which he sought to preclude B from identifying him as the person in the Campfield Avenue video footage, arguing that, under the totality of the circumstances test set forth in *State* v. *Gore*, 342 Conn. 129, 150–51, 269 A.3d 1 (2022), any such testimony should be excluded as a result of her

to both mixtures. With respect to the sample collected from the driver's side door handle, a forensic examiner concluded from the DNA analysis, after assuming that the victim was one of three contributors, that the DNA profile was at least 100 billion times more likely to occur if it had come from the defendant, the victim and one unknown individual, than if it had come from the victim and two unknown individuals. As to the sample collected from the steering wheel, a forensic examiner concluded from the DNA analysis, after assuming that the victim was one of five contributors, that the DNA profile was at least twenty-one billion times more likely to occur if it had come from the defendant, the victim and three unknown individuals, than if it had come from the victim and four unknown individuals.

[9] In accordance with our policy of protecting the privacy interests of the victims of domestic violence, we decline to identify B, who was the victim of an assault in another criminal case involving the defendant.

"undeniable bias toward the defendant . . . ." On January 24, 2023, the second day of trial, the court held a hearing on the defendant's motion in limine outside the presence of the jury. At the hearing, the prosecutor called B as a witness and showed her the Campfield Avenue video footage. After she viewed the footage, B testified, inter alia, that she was "1025 percent . . . sure" that the defendant is the person in the footage. Following cross-examination of B and arguments of counsel, the court denied the defendant's motion in limine. Thereafter, the jury was brought back into the courtroom, and B identified the defendant as the person in the Campfield Avenue video footage.

At trial, the state also presented testimony from, inter alia, Jones; the victim; John Dibiase, the Cromwell resident who provided the police with the New Lane Street video footage, which was admitted into evidence; Javier Ortiz, the Hartford resident who allowed the police to record the Campfield Avenue video footage, which was admitted into evidence; Jennifer Green, the state forensic examiner who tested the samples taken from the victim's bite wound and vehicle; and Frances Rue, the state forensic examiner who conducted the DNA analyses of the samples. At the conclusion of trial, the jury found the defendant not guilty of the larceny and assault charges, and guilty of the remaining three charges. On April 18, 2023, the court, *Oliver, J.*, sentenced the defendant to a total effective term of nineteen years of incarceration, followed by four years of special parole with recommended special conditions.[10] This appeal followed. Additional facts and procedural history will be set forth as necessary.

---

[10] Because the defendant's conviction of robbery in the first degree as charged involved the robbery of an occupied motor vehicle, the defendant's sentence was subject to a mandatory, nonsuspendible three year enhancement pursuant to General Statutes § 53a-136a.

I

The defendant first claims that the trial court abused its discretion by permitting B to identify him in court as the person in the Campfield Avenue video footage. We are not persuaded.

We first set forth our standard of review and legal principles that govern our resolution of this claim. "Whether to admit opinion testimony identifying an individual in a surveillance video or photograph is an evidentiary ruling that will not be disturbed unless it amounts to an abuse of discretion." *State* v. *Sumler*, 217 Conn. App. 51, 62, 287 A.3d 211 (2022), cert. denied, 346 Conn. 914, 290 A.3d 376 (2023). In *State* v. *Gore*, supra, 342 Conn. 129, our Supreme Court held "that opinion testimony that relates to the identification of persons depicted in surveillance video or photographs is not inadmissible solely because it embraces an ultimate issue. Lay opinion testimony identifying a person in surveillance video or photographs is admissible if that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence. That is, such testimony is admissible if the opinion is 'rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.' Conn. Code Evid. § 7-1." (Footnote omitted.) *State* v. *Gore*, supra, 148.

Our Supreme Court explained further that, "as a general rule, nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs is admissible only if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury. . . . In making this determination, courts evaluate the totality of the circumstances. . . . Courts consider the following four factors relevant to determining whether the witness is more likely to correctly identify

the defendant than is the jury: (1) the witness' general level of familiarity with the defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." (Citations omitted; internal quotation marks omitted.) Id., 150–51.

With respect to the issue of the witness' familiarity with the defendant's appearance, our Supreme Court held that "the low threshold for general familiarity applied in virtually all jurisdictions that have considered the admissibility of lay witness identifications of a defendant in surveillance video or photographs does not afford sufficient protection to criminal defendants against good faith mistaken identifications. We believe that the better rule is to require, in order for the witness' general familiarity with the defendant's appearance to weigh in favor of admissibility, that the proponent of the testimony demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant. We acknowledge that we are eschewing the bright line rule applied by other jurisdictions in favor of one that relies on trial courts to exercise their discretion to determine whether this factor supports admissibility. That determination will rest on the facts and circumstances of each case." Id., 158–59. "Because we consider the totality of the circumstances to determine whether opinion testimony identifying an individual is admissible, no single factor is dispositive." *State* v. *Sumler*, supra, 217 Conn. App. 64.

Having delineated the totality of the circumstances test of *Gore*, we now set forth the following additional

facts related to the trial court's denial of the defendant's motion in limine and admission of B's identification testimony. In his motion in limine, the defendant conceded that the first two prongs of the *Gore* test, both of which relate to the witness' familiarity with the defendant, were satisfied and argued, instead, that her testimony would not be helpful to the jury, as the video footage was of good quality and sufficient for the jury to draw its own conclusion, and that nothing had changed about his appearance.

At the hearing outside the presence of the jury, defense counsel argued that, because *Gore* adopted a test based on the totality of the circumstances, B's purported bias against the defendant needed to be considered, and that her testimony supported weighing the third and fourth *Gore* factors in the defendant's favor. Defense counsel further argued that "admitting [B's] testimony puts this defendant in a position of doing [one of] two things—either he doesn't question [her] because of all the baggage that's going to come with it, and because of opening evidentiary doors into another criminal case . . . [or] [h]is second option is to do exactly that and have a trial within a trial about [her] feelings about [the defendant] and about another criminal case that is pending in this courthouse; I don't think that's fair to [the] defendant. . . . One thing that *Gore* comes down to . . . is whether . . . the witness' testimony is going to help the jury. Now, I would argue that any help that [B] can give this jury will be greatly outweighed by the prejudice and greatly outweighed by the disservice that she does to this jury, by the wasting time [and] by the prejudice to this defendant. So, I would ask that that testimony be precluded."

The court inquired of defense counsel as to why he was limiting his options "to either . . . not questioning [B] at all, or having a trial within a trial, specifically referring to the charges, as opposed to doing . . . 80

to 85 percent of what [he had done at the hearing] without the jury present, just not mentioning the charges . . . ." Defense counsel responded: "I understand that you're the gatekeeper. My concern is opening the door, right? If I ask too many questions of [B] as to her bias with my client, I risk opening the door to the state standing up and saying . . . [i]sn't it because he beat you? Isn't it because he assaulted you in May, 2022? And have all of that evidence come in." The court then heard from the prosecutor, who countered that all of the *Gore* factors except the third one weighed in the state's favor and that a witness' bias goes to the weight of the evidence, not its admissibility, as *Gore* and its progeny do not discuss bias as a factor to be considered when determining admissibility.

After hearing argument from both the prosecutor and defense counsel, the court orally denied the defendant's motion in limine, first addressing the issue of bias raised by the defendant and then applying the four factors set forth in *Gore*.[11] As to the issue of bias, the court stated:

[11] Although it ruled that B's identification testimony was admissible, the court specifically addressed defense counsel's concerns about the potential for opening the door to testimony about the basis for B's alleged bias toward the defendant, stating to the prosecutor that, "as to any thought of the state getting into any domestic violence issues or the pending charges, or the reason why she might have certain feelings against the defendant, if you think you might be getting anywhere near nudging open a door that you think was initially cracked open by counsel, I'd ask you suggest a recess; we'll take it up outside the presence of the jury."

After the court made that statement, the following exchange occurred between defense counsel and the court:

"[Defense Counsel]: And just, Your Honor, in line with that . . . in light of your ruling on this, you had indicated that . . . there's a middle ground where I could ask some questions similar to the ones that I asked her in voir dire.

"The Court: I think more than middle. I think if you're getting to the part of naming specific charges, you take that risk yourself. I've had . . . other hearings and had you argue plenty of times, and I know you have lots—a lot of criminal experience, especially in examining witnesses, and you know how to tread the line. I certainly do not agree that you're limited to either not questioning her at all, or going all out and knocking, kicking open every door so that you invite [the prosecutor] to get into the specifics of the, I

"Bias obviously relates to credibility, [and] credibility is always an issue. So, the court does weigh bias in terms of admissibility and [during] the weight versus admissibility analysis, and then of course whether this testimony would be more prejudicial than probative." In applying the *Gore* factors, the court determined that (1) factor one weighed in favor of admissibility because "[B has] not been challenged on her approximate ten year familiarity with the defendant off and on since high school, and it seems continuously for approximately the last three to four years, living together during that time, [and] having two children in common with him. And as it relates to the last contact, last seeing him approximately three months ago . . . [on] Halloween [of] 2022"; (2) factor two weighed in favor of admissibility because "[B] obviously lived with the defendant, including [before, during and after] the time he's alleged to have committed these offenses . . . . According to her testimony, although . . . the court would find fairly common the clothing worn, [the court notes her] testimony as to [the defendant's] tendency to wear the white tank top in the summer, khakis and/or basketball shorts in the summer, and [to wear what] she characterized as slides"; (3) factor three weighed against admissibility because "[B] testified that, other than having apparently taken off some weight between the time of the video and today, there's been no change in [the defendant's] appearance"; and (4) factor four weighed in favor of admissibility because "the video is clear, but in terms of being zoomed in and being able to identify the defendant's face, it is not so clear . . . [a]s to find that . . . [B's] testimony would not aid the jury in its fact-finding mission as to identification; [the video] is certainly not hopelessly obscure . . . ." Thus, the court

guess, the [pending domestic violence assault case], and I don't know the other charges, strangulation. I don't think those are your only options. I think you've done pretty much what you could do in front of the jury, apart, perhaps, from mentioning the charges, as you could do."

denied the defendant's motion in limine, concluding that "the testimony of . . . [B] would aid the jury in its fact-finding duties as to the identification of [the] individual depicted in [the] three [video] clips contained in the exhibit."

Later that day, B testified before the jury, inter alia, that she had known the defendant off and on for about ten years and that the two of them formerly were in an intimate relationship for about three years, during which time they lived together and had two children. She testified further that there has been no marked change in the defendant's appearance since 2020; that the defendant typically wore khaki or basketball shorts, tank tops, and slides during the summer; and that she was "very certain" that the defendant was the person depicted in the Campfield Avenue video footage based on what the person was wearing, the body type of the person, and a visible tattoo of her daughter's name on the person's chest. She also testified that, sometime in July, 2020, she had picked up the defendant at a location near where the victim's vehicle was recovered in Hartford. B acknowledged on cross-examination that she previously had stated that she never wanted the defendant to be around her children again and that she wanted him to pay for what he had done to her.

A

On appeal, the defendant does not challenge the trial court's application of the *Gore* factors. Rather, in support of his claim that the court abused its discretion in admitting B's identification testimony, he makes three arguments, two of which concern the court's failure to consider certain additional factors during its *Gore* analysis, and the last of which relates to the prejudicial nature of B's identification testimony. We address these arguments in turn.

1

The defendant first argues that, in conducting its *Gore* analysis, the court should have considered the suggestive way in which B was shown the video footage, namely, the fact that she was shown the video footage in the courtroom during the defendant's trial. In support of this contention, the defendant, in effect, asserts that the suggestiveness issues that arise when an *eyewitness* makes an identification of a defendant for the first time in court; see *State* v. *Dickson*, 322 Conn. 410, 446, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017);[12] also are present when a nonpercipient witness is first shown a video in a courtroom and makes an identification of a defendant in court from that video. According to the defendant, "the manner in which" the video evidence was "first shown to" B resulted in her having an "expectation that the video would depict [the defendant] . . . ." In other words, when B "saw the video [evidence] in the courtroom and, of course, knew that [the defendant] was on trial," she would have "had every reason to expect that she was being shown the video because the prosecutor believed it depicted [the defendant]." Thus, the defendant asserts, the "court should have considered whether this expectancy reduced the potency of [B's] familiarity . . . ."

The state counters, inter alia, that the record is inadequate to review any argument concerning the manner in which B was first shown the video footage, as there

---

[12] In *Dickson*, our Supreme Court addressed the inherent suggestiveness of first-time, in-court identifications by eyewitnesses. See *State* v. *Dickson*, supra, 322 Conn. 422–23. After finding that "[first-time] in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court"; id., 426; the court concluded "that *any* [first-time] in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation." (Emphasis in original.) Id., 426 n.11.

is no evidence in the record concerning whether the evidentiary hearing was the first time that B saw the Campfield Avenue video footage. We agree with the state.

"It is the responsibility of the appellant to provide an adequate record for review." Practice Book § 61-10 (a); *State* v. *Walker*, 319 Conn. 668, 678, 126 A.3d 1087 (2015). This rule recognizes that our role as a reviewing court "is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court. . . . [Otherwise], we are left to guess or speculate as to the existence of a factual predicate." (Internal quotation marks omitted.) *State* v. *Kalican*, 110 Conn. App. 743, 755, 955 A.2d 1261, cert. denied, 289 Conn. 949, 960 A.2d 1038 (2008). "It is axiomatic that this court will not resort to speculation and conjecture in avoidance of an inadequate record." *State* v. *Durdek*, 184 Conn. App. 492, 505, 195 A.3d 388, cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018). "[A] lack of pertinent factual findings and legal conclusions will render a record inadequate. . . . Similarly, ambiguity in a record can render it inadequate." (Citation omitted; internal quotation marks omitted.) *State* v. *Ruscoe*, 119 Conn. App. 834, 841, 989 A.2d 667, cert. denied, 296 Conn. 903, 992 A.2d 330 (2010).

In the present case, the defendant concedes in his principal appellate brief that "[t]here is no evidence about whether [his trial] was the first time [that B] saw the video." The factual predicate for the defendant's argument is that B was shown the Campfield Avenue video footage for the first time at his trial. Nothing in the record, however, establishes when B first viewed this video evidence, and, therefore, we would be "left to guess or speculate as to the existence of a factual predicate"; (internal quotation marks omitted) *State* v. *Kalican*, supra, 110 Conn. App. 755; if we addressed this argument. See *State* v. *Salerno*, 36 Conn. App. 161,

166, 649 A.2d 801 (1994) ("it is not the function of this court to find facts"), appeal dismissed, 235 Conn. 405, 666 A.2d 821 (1995); see also *State* v. *Gasser*, 74 Conn. App. 527, 535, 812 A.2d 188 (concluding that defendant failed to present adequate record for review because resolving his claim on basis of record presented would require court to "speculate as to [a] factual determination"), cert. denied, 262 Conn. 954, 818 A.2d 781, cert. denied, 540 U.S. 823, 124 S. Ct. 153, 157 L. Ed. 2d 43 (2003).[13] We, therefore, decline to consider this argu-

[13] Even if the record contained the factual predicate necessary for this court to consider this argument, it would nevertheless fail on the merits because the defendant's assertion that "[t]he same suggestiveness problem [associated with eyewitness identifications] arises when a [nonpercipient] witness is shown a video [in court] and asked whether it depicts the defendant" ignores the important distinctions between identification testimony from an *eyewitness* and identification testimony from a *nonpercipient* witness. See *State* v. *Gore*, supra, 342 Conn. 150 (observing that "identifications of a defendant in surveillance video or photographs differ from eyewitness identifications" because "[a]n eyewitness . . . testifies regarding something that the jury cannot itself observe," whereas "a witness who identifies the defendant in surveillance video or photographs testifies regarding material that the jury also is able to observe").

In *Gore*, our Supreme Court addressed the concern raised by the defendant's argument as to a witness' "expectancy," stating: "We particularly note that, although familiarity increases the accuracy of identifications, these identifications are not immune from detracting factors such as expectations (the belief that one will come across a familiar face), the presence of a disguise, cross-racial identifications, and an increased distance between the witness and the target individual. . . . Requiring more than a minimal degree of familiarity provides greater assurance that a witness' identification of a defendant in surveillance footage will be less affected by these detractors." (Citation omitted.) *State* v. *Gore*, supra, 342 Conn. 163. For that reason, the court "decline[d] to join the majority of jurisdictions that adhere to a minimum threshold for general familiarity and [held] that the degree of a witness' familiarity with a defendant goes to the admissibility of the witness' identification of the defendant in surveillance video or photographs. In order for the witness' general familiarity with the defendant's appearance to weigh in favor of admitting such testimony, the proponent of the testimony must demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant. Some illustrative examples of persons who may satisfy this standard are friends, longtime acquaintances, neighbors, coworkers, family members, and former classmates." Id., 163–64. Accordingly, our Supreme Court addressed this argument in establishing the test set forth in *Gore*. We, therefore, find this argument unavailing.

ment.[14] See, e.g., *D2E Holdings, LLC* v. *Corp. for Urban Home Ownership of New Haven*, 212 Conn. App. 694, 709, 277 A.3d 261 (record was inadequate to consider arguments raised on appeal), cert. denied, 345 Conn. 904, 282 A.3d 981 (2022).

2

Next, the defendant argues that the trial court should have considered B's purported bias during its totality of the circumstances analysis under *Gore*. Specifically, he contends that the "court was privy to more information about the then pending charges than the jury would be and therefore was better positioned than the jury to find that [B's] bias outweighed any benefit of her familiarity" with the defendant. He further asserts that he "could not expose the reason why [B] was biased against him and might identify him as the person in the video without fully informing the jury that [B] alleged he had strangled her and that criminal charges were pending." Therefore, he argues that the court should have considered his inability to fully cross-examine the witness regarding her bias as part of its admissibility analysis under *Gore*. Notably, the defendant does not argue that his constitutional right of confrontation was violated; rather, he suggests that it was unduly restricted by the court's decision to admit B's identification testimony, and he cites *United States* v. *Calhoun*, 544 F.2d 291, 297 (6th Cir. 1976),[15] for the proposition

---

[14] We note, however, that the test established in *Gore* was designed precisely to address situations like the one in the present case, in which a nonpercipient witness makes an in-court identification from a surveillance photograph or video. See footnote 13 of this opinion.

[15] In *Calhoun*, the United States Court of Appeals for the Sixth Circuit held that it was an abuse of discretion for the trial court to have admitted testimony from the defendant's parole officer, who identified the defendant as the perpetrator shown in a bank surveillance photograph. See *United States* v. *Calhoun*, supra, 544 F.2d 294–95. The Sixth Circuit found that the "main defect" in permitting such testimony was that "[t]he defendant could not explore the possible motives his parole officer might harbor in positively identifying him as the robber." Id., 295.

In the present case, the state has directed our attention to *Commonwealth* v. *Guillaume*, Docket No. 13-P-1401, 2015 WL 808462 (Mass. App. February

that "defense counsel should not be forced to [choose] between 'the rock and the whirlpool' when cross-examining a nonpercipient witness who knows of the defendant's past misconduct or convictions." We are not persuaded.

First, the court, at least to some extent, did consider bias in its determination. As we noted in part I of this opinion, on the issue of bias, the court stated: "Bias obviously relates to credibility, [and] credibility is always an issue. So, the court does weigh bias in terms of admissibility and [during] the weight versus admissibility analysis, and then of course whether this testimony would be more prejudicial than probative." Moreover, as a general rule, a witness' potential bias goes to the weight, not the admissibility, of the witness' testimony. See, e.g., *State* v. *Harris*, 277 Conn. 378, 390, 890 A.2d 559 (2006) ("allegations of witness bias affect the *weight* that the fact finder gives to the evidence, not its *admissibility*" (emphasis in original)); *State* v. *Warren*,

27, 2015) (decision without published opinion, 87 Mass. App. 1107, 25 N.E.3d 912), review denied, 471 Mass. 1105, 31 N.E.3d 586 (2015), in which the Appeals Court of Massachusetts noted that "*Calhoun* appears to stand alone among the [f]ederal courts" and that, instead, "the general view . . . is to inquire whether 'the probative value of the testimony outweighed any prejudicial effect and also that any limitation on cross-examination resulted from a tactical decision by the defendant.' " Id., *3. We agree with the characterization of *Calhoun* by the Appeals Court of Massachusetts and similarly decline to follow *Calhoun*. See, e.g., *United States* v. *Contreras*, 536 F.3d 1167, 1171–72 (10th Cir. 2008) (disagreeing with *Calhoun* and rejecting claim that defendant was unduly prejudiced as result of inability to cross-examine witness fully and holding, instead, that trial court did not abuse its discretion in admitting testimony from defendant's probation officer identifying defendant as perpetrator of robbery from surveillance video footage), cert. denied, 555 U.S. 1117, 129 S. Ct. 942, 173 L. Ed. 2d 142 (2009); *United States* v. *Farnsworth*, 729 F.2d 1158, 1161 (8th Cir. 1984) (rejecting holding of *Calhoun* because court "disagree[d] that the constraints on cross-examination in this situation are so extreme that the admission of a parole officer's identification is per se an abuse of discretion"); *People* v. *Thompson*, 49 N.E.3d 393, 406 (Ill. 2016) (agreeing with "overwhelming majority of federal courts" that have declined to follow per se rule of *Calhoun* finding abuse of discretion when law enforcement officers provide identification testimony).

100 Conn. App. 407, 420, 919 A.2d 465 (2007) ("bias did not affect the admissibility of the [challenged evidence] but was a matter concerning the weight the fact finder should afford it"); see also *State* v. *Gore*, supra, 342 Conn. 150 (*Gore* factors apply when determining *admissibility* of "nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs").

To the extent that the defendant argues that the bias of a nonpercipient witness and "the expected cross-examination of the witness" should be considered as part of a *Gore* totality of the circumstances analysis—an issue that Connecticut courts have not yet considered—we reject this argument and decline to impose additional requirements into the test set forth by our Supreme Court in *Gore*. In reaching this decision, we are guided, in part, by case law from federal courts, which have addressed the issue concerning bias in relation to nonpercipient witnesses. Our examination of this aspect of the defendant's argument involves a matter of law subject to plenary review. See, e.g., *State* v. *Parker*, 201 Conn. App. 435, 447, 242 A.3d 132 (2020) ("whether trial court correctly applied legal standard raises question of law subject to plenary review").

In *United States* v. *Jackman*, 48 F.3d 1, 4 (1st Cir. 1995), the United States Court of Appeals for the First Circuit was presented with an issue of first impression in that circuit concerning the admissibility of opinion testimony identifying a defendant from surveillance photographs. The defendant in *Jackman* had been charged in connection with the robbery of a bank in Massachusetts. Id., 2. Because he previously had been tried and convicted of a bank robbery in Connecticut, the trial court admonished the prosecutor not to make any references to the Connecticut bank robbery. Id., 3. The defendant's former wife and two acquaintances identified the defendant from a photograph taken of

the perpetrator of the Connecticut robbery before viewing and identifying him from photographs taken of the Massachusetts robber. Id., 2. Following his conviction for the Massachusetts robbery, the defendant appealed, arguing, inter alia, that the testimony of the three nonpercipient witnesses should have been excluded because it was not helpful to the jury and was not susceptible to cross-examination. Specifically, the defendant asserted that, due to the trial court's ruling precluding the prosecutor from referencing the Connecticut robbery, he could not effectively cross-examine those witnesses about the effect their viewing of the surveillance photograph from the Connecticut robbery had on their subsequent in-court identification of him from the Massachusetts photographs. Id., 6. In rejecting this argument, the court held: "The court's ruling . . . could not possibly be construed as meaning that the *defendant* could not elicit testimony related to the Connecticut bank robbery on cross-examination. Defendants are often confronted with witnesses who possess knowledge of the defendant's past criminal history, knowledge that cannot be introduced by the prosecution. Although such knowledge could potentially be a source of bias infecting the [witness'] testimony, we know of no evidentiary doctrine that would ordinarily exclude such testimony simply because cross-examination by the defendant about that knowledge could be highly damaging to his case. Thus, [the defendant's] failure to cross-examine these witnesses on this issue was not ordained by the court, but was instead a tactical decision. See [*United States* v. *Wright*, 904 F.2d 403, 406 (8th Cir. 1990)] (defendant's decision not to cross-examine law enforcement officers for bias was tactical decision) . . . ." (Citation omitted; emphasis in original.) *United States* v. *Jackman*, supra, 6.

Similarly, in *United States* v. *Allen*, 787 F.2d 933, 934 (4th Cir. 1986), vacated on other grounds, 479 U.S. 1077,

107 S. Ct. 1271, 94 L. Ed. 2d 132 (1987), "[t]he main issue on appeal concern[ed] the propriety of testimony by a police officer and a parole officer identifying [the defendants] as the individuals appearing in bank surveillance photographs." On appeal, the defendants argued that the identification testimony was "unfairly prejudicial because [the] defendants were limited in their cross-examination for fear of revealing their prior criminal activities." Id., 935. That claim arose "from a perceived inability to probe [the] witnesses for bias. Such a probe, [the defendants claimed], would inescapably divulge to the jury the reason for the asserted bias—the witness' knowledge of [the] defendants' prior criminal activity. [The] [d]efendants claim[ed] [that] this limitation on cross-examination made the testimony unfairly prejudicial to their case." Id., 937. The United States Court of Appeals for the Fourth Circuit rejected this argument, stating that any "[l]imitation of cross-examination was . . . the result of a tactical choice by [the] defendants similar to those frequently faced at trial. Nothing in the [Federal] Rules of Evidence or any other source is intended to relieve criminal defendants from difficult strategic decisions. The decision of a criminal defendant to take the stand on his own behalf, for example, may result in revelation of prejudicial material a defendant would like to suppress. Courts, however, have felt no obligation to make the choice of a defendant to testify risk-free. See, e.g., *Harris* v. *New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971). [T]he [d]efendants chose to limit cross-examination, and we see no reason to insulate them from the natural consequences of that choice." *United States* v. *Allen*, supra, 937; see also *United States* v. *Stormer*, 938 F.2d 759, 763 (7th Cir. 1991).

In the present case, the trial court did not place any restrictions on the defendant's cross-examination and, in fact, remarked that it believed that defense counsel had cross-examined B to the fullest extent possible,

apart from mentioning the other charges. Nothing in the case law from other jurisdictions addressing the issue of bias in relation to nonpercipient witnesses supports a determination that bias should factor into a court's analysis under *Gore* of the *admissibility* of testimony from a nonpercipient witness, which would be a departure from our long-standing evidentiary rule that bias concerns the weight to be afforded to a witness' testimony and *not its admissibility*. See, e.g., *State* v. *Harris*, supra, 277 Conn. 390. Likewise, the defendant has provided no authority demonstrating that a nonpercipient witness' identification testimony should be excluded when, as here, a defendant faces a difficult tactical decision regarding the scope of cross-examination of that witness' alleged bias.[16]

---

[16] In his appellate reply brief, the defendant asserts that this court should consider *People* v. *Mosley*, 41 N.Y.3d 640, 239 N.E.3d 928, 215 N.Y.S.3d 303 (2024), in which the Court of Appeals of New York held that the lower court had abused its discretion in admitting testimony from a nonpercipient witness, who was a police officer, because (1) "the [state] did not establish that [the witness] was sufficiently familiar with [the defendant] to render his identification helpful to the jury"; id., 650; and (2) "the [state] failed to demonstrate that the jury needed [the witness'] help." Id., 651. In reaching that decision, the court noted that "[t]he admission of [the witness'] testimony in this case illustrates the challenges of cross-examination inherent in lay opinion identification testimony *from law enforcement*" and, thus, "caution[ed] trial courts to admit this kind of identification testimony only in limited and necessary circumstances with all appropriate safeguards . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 652. We conclude that *Mosley* is inapposite to the present case.

In *Mosley*, a police officer had identified the defendant from "a grainy video of a man running through the street and firing three shots into a van." Id., 643. That video was the only evidence tying the defendant to the crime. Id. During voir dire, outside the presence of the jury, the witness, a homicide detective, explained that he had met the defendant when the defendant was brought to the police precinct as a suspect in a different crime. Id. He described his interactions with the defendant at the precinct but could not recall having any " 'street interactions' " with the defendant. Id., 644. The trial court instructed the witness to avoid mentioning the unrelated criminal investigation in order to avoid "airing prejudicial information about other police interactions before the jury . . . ." Id. The witness thereafter testified that he knew the defendant from " 'canvassing' in the area around where the shooting took place," which overstated his familiarity with the defendant and resulted in the defense being unable to thoroughly cross-examine him about this aspect of his familiarity with the defendant. Id., 652.

Moreover, our Supreme Court in *Gore* specifically stated that, "[i]n light of our restriction of this type of testimony to witnesses who possess more than a minimal degree of familiarity with the defendant, we deem it unnecessary at this time to require any additional procedural protections in this context. Requiring more than a minimal degree of familiarity in order for this prong to weigh in favor of admissibility significantly reduces the risk of mistaken identifications." *State* v. *Gore*, supra, 342 Conn. 161. Despite this clear statement from our Supreme Court declining "to require additional procedural protections in this context"; id.; the defendant, nonetheless, argues that the circumstances of his case warrant considerations in addition to the ones set forth in *Gore* before a trial court can admit identification testimony from a nonpercipient witness, mainly because the witness in this case, B, was adverse to him. We are not persuaded, especially when the additional considerations the defendant advocates for concern either a matter of trial tactics or the weight to be afforded to evidence, not its admissibility.

3

Finally, the defendant argues that the trial court's admission of B's identification testimony was an abuse

---

On appeal in *Mosley*, the court noted the attendant issues that may arise when a nonpercipient witness is a member of law enforcement; see, e.g., *Commonwealth* v. *Pleas*, 49 Mass. App. 321, 327, 729 N.E.2d 642 ("[i]dentification testimony from a police officer who is so designated increases the potential for inappropriate prejudice to the defendant"), review denied, 432 Mass. 1105, 733 N.E.2d 1066 (2000); and concluded that the witness was not sufficiently familiar with the defendant to render the witness' identification helpful to the jury. See *People* v. *Mosley*, supra, 41 N.Y.3d 648–50.

The facts of the present case differ from *Mosley* in that the nonpercipient witness, B, was not a member of law enforcement, there was no issue about B's familiarity with the defendant, there was no indication that B had mispresented her relationship with the defendant such that defense counsel could not fully cross-examine her about her familiarity with the defendant, and B's identification was not the only evidence linking the defendant to the robbery of the victim.

of its discretion because the testimony was more prejudicial than probative.[17] We disagree.

Pursuant to § 4-3 of the Connecticut Code of Evidence, "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." As noted by our Supreme Court in *State* v. *Hill*, 307 Conn. 689, 59 A.3d 196 (2013), the "four factors relevant to determining whether the admission of otherwise probative evidence is unduly prejudicial . . . are: '(1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it.' " Id., 698. "Evidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State* v. *Graham*, 200 Conn. 9,

---

[17] In the present case, the court did not make an express finding regarding the probative versus prejudicial value of B's identification testimony. It did, however, state in its decision denying the defendant's motion in limine that "[b]ias obviously relates to credibility, [and] credibility is always an issue. So, the court does weigh bias in terms of admissibility and [during] the weight versus admissibility analysis, and then of course whether this testimony would be more prejudicial than probative." See parts I and I A 2 of this opinion. In light of this statement, the court necessarily must have found B's identification testimony more probative than prejudicial when it decided that the testimony was admissible. See *M. C.* v. *A. W.*, 226 Conn. App. 444, 452, 319 A.3d 183 (2024) ("the court's decision 'may include implicit findings that it resolved any credibility determinations and any conflicts in testimony in a manner that supports its ruling' "). The defendant has not raised any argument in this appeal concerning the court's failure to make an express finding concerning the probative versus prejudicial value of the testimony. We, therefore, review the court's implicit finding for an abuse of discretion.

12, 509 A.2d 493 (1986); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.5.1, pp. 151–52. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted." (Internal quotation marks omitted.) *State* v. *Jones*, 351 Conn. 324, 332, 330 A.3d 118 (2025). "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by [an appellate court], therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Raynor*, 337 Conn. 527, 562, 254 A.3d 874 (2020).

In light of B's past history and familiarity with the defendant, her identification testimony was probative evidence of the identity of the person in the Campfield Avenue video footage.[18] In fact, the defendant concedes that B's "testimony was probative to the extent that the trial court believed her familiarity with [the defendant] gave her a 'wealth of experience' that rendered her

---

[18] See, e.g., *State* v. *Gore*, supra, 342 Conn. 164 ("When a witness who is familiar with the defendant's appearance views surveillance video or photographs that may or may not depict him, that witness brings to the task of identification an ability the jury cannot acquire in the context of a criminal trial. The witness' process of recognition is informed by having observed the defendant in different contexts, over an extended period of time. That wealth of experience renders the testimony helpful to the jury."); see also *United States* v. *Wiley*, 78 F.4th 1355, 1362 (11th Cir. 2023) ("familiarity derived from a [witness'] close relationship to, or substantial and sustained contact with, the defendant weighs heavily in favor of admitting the [witness'] identification testimony" (internal quotation marks omitted)); *Hardy* v. *State*, 804 So. 2d 247, 270–71 (Ala. Crim. App. 1999) (same), aff'd sub nom. *Ex parte Hardy*, 804 So. 2d 298 (Ala. 2000), cert. denied, 534 U.S. 1043, 122 S. Ct. 621, 151 L. Ed. 2d 543 (2001); *Commonwealth* v. *Pleas*, 49 Mass. App. 321, 326–27, 729 N.E.2d 642 (nonpercipient witness identification testimony "is admissible . . . when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess" (internal quotation marks omitted)) (quoting *United States* v. *Jackman*, supra, 48 F.3d 4–5), review denied, 432 Mass. 1105, 733 N.E.2d 1066 (2000).

testimony helpful to the jurors." In arguing that B's identification testimony was unduly prejudicial, the defendant raises similar arguments regarding bias and his ability to cross-examine B fully, namely, that he "could not challenge [B's] credibility without the jurors learning, at minimum, that [his former girlfriend], the mother of his daughter, hated and feared him." Applying the four factors set forth in *Hill*, we are not persuaded. B's identification testimony consisted merely of her statements that she was familiar with the defendant from a prior romantic relationship with him and that she believed the person depicted in the Campfield Avenue video footage was the defendant. Although she acknowledged on cross-examination that she previously had stated that she never wanted the defendant to be around her children again and testified further that she wanted him to pay for what he had done to her, that testimony would not have unduly aroused the emotions of the jurors, nor did it create a side issue. Her testimony also did not consume a large amount of time or unfairly surprise the defendant.

The defendant's contention that B's testimony was unduly prejudicial due to the fact that he could not cross-examine her fully regarding the prior domestic violence incident and the pending criminal charges against him is unavailing. As we have stated, any limitation on the defendant's cross-examination of B was a tactical choice of the defendant, which did not render B's testimony unfairly prejudicial. See, e.g., *United States* v. *Contreras*, 536 F.3d 1167, 1172 (10th Cir. 2008) (rejecting claim that identification testimony of nonpercipient witness was unfairly prejudicial because defendant could not fully cross-examine witness, as defendant made tactical decision not to cross-examine witness, which did not result in unfair prejudice), cert. denied, 555 U.S. 1117, 129 S. Ct. 942, 173 L. Ed. 2d 142 (2009). The defendant has provided no authority

demonstrating that B's testimony, which itself was not unduly prejudicial, was rendered prejudicial as a result of the fact that his counsel might have to inquire into the issue of domestic violence between B and the defendant to be able to establish fully B's bias against the defendant.

Accordingly, the defendant has failed to establish his claim that B's testimony was more prejudicial than probative, and we conclude that the court's admission of B's identification testimony did not constitute an abuse of its discretion.

B

Even if this court were to assume, arguendo, that the admission of B's identification testimony was improper, any such error was harmless, as the defendant has failed to demonstrate that he was harmed by the trial court's failure to preclude B's identification testimony. See, e.g., *State* v. *Outlaw*, 350 Conn. 251, 283, 324 A.3d 107 (2024) ("[t]he question that is ultimately before [a reviewing court] is whether the admission of [the] evidence, even if [the court] were to assume it was improper, was harmful"); see also *State* v. *Johnson*, 351 Conn. 53, 72, 328 A.3d 143 (2025).

The defendant does not claim that the trial court's ruling amounted to a constitutional violation. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the

impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Outlaw*, supra, 350 Conn. 283–84; see also *State* v. *Lindsay*, 143 Conn. App. 160, 170, 66 A.3d 944 ("[a] determination of harm requires [a reviewing court] to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial" (internal quotation marks omitted)), cert. denied, 310 Conn. 910, 76 A.3d 626 (2013).

After reviewing the totality of the evidence adduced at trial, we conclude that the defendant has failed to meet his burden of demonstrating that he was harmed by the admission of B's identification testimony.[19] First, the state presented testimony from forensic examiners at the state laboratory, along with a supplemental DNA report, confirming that amylase—a component of saliva—containing the defendant's DNA profile was found on the bite wound on the victim's arm, that the defendant's DNA profile could not be eliminated as a contributor to the samples collected from the interior of the victim's car, and that the mixture extracted from the victim's bite wound contained more of the defendant's DNA profile than it did the victim's.[20] See *Maryland* v. *King*, 569 U.S. 435, 442, 451, 133 S. Ct. 1958,

[19] The defendant argues that the admission of B's testimony harmed him because, inter alia, "[a]bsent [her] testimony, the state's case was weak," given that the victim failed to pick the defendant's photo out of a photographic array shown to him by the police, the DNA evidence was found on the victim's skin, as opposed to somewhere "where it could not [have] come from another source," and, although the defendant "generally fit [the victim's] description of the culprit," there was another suspect who also fit that description.

[20] In support of his argument, the defendant asserts that "an inculpatory DNA result is not itself sufficient evidence that the defendant committed a

186 L. Ed. 2d 1 (2013) (acknowledging "DNA testing's unparalleled ability both to exonerate the wrongly convicted and to identify the guilty," and "the unparalleled accuracy DNA [evidence] provides" (internal quotation marks omitted)); *State* v. *Quail*, 168 Conn. App. 743, 766, 148 A.3d 1092 (recognizing that, "in particular criminal convictions, DNA evidence may be the most compelling evidence of an accused's guilt"), cert. denied, 323 Conn. 938, 151 A.3d 385 (2016); see also *People* v. *Lazarus*, 238 Cal. App. 4th 734, 788, 190 Cal. Rptr. 3d 195 (2015) ("[t]he evidence . . . combined with the presence of [the defendant's] DNA on a wound inflicted on the victim during her struggles with her assailant . . . provided convincing evidence of [the defendant's] guilt"), review denied, California Supreme Court, Docket No. S229527 (October 28, 2015); *State* v. *Price*, Docket No. W2009-00083-CCA-R3-CD, 2010 WL 376625, *8 (Tenn. Crim. App. February 3, 2010) (concluding that evidence "was more than sufficient to establish the defendant's identity as the perpetrator" when, inter alia, "[t]he perpetrator bit the victim's arm . . . and the DNA profile obtained from saliva in the bite wound was . . . conclusively matched to the defendant's DNA"), appeal denied, Tennessee Supreme Court, Docket No. W2009-00083-SC-R11-CD (June 17, 2010). The DNA evidence presented by the state constituted strong evidence of the defendant's guilt.

The defendant attempts to discount the significance of the DNA evidence by suggesting that "the DNA could have been [the result of a] secondary transfer, or left in [the victim's] car on some prior occasion." This suggestion, however, is belied by the victim's testimony. In particular, the victim testified that he met the defendant for the first time on July 26, 2020, the night of the

crime." We find this assertion inapplicable under the circumstances of this case, as it fails to take into account the other substantial circumstantial evidence before the jury, in addition to the DNA evidence.

incident, and did not know the defendant at any point prior to the incident, that he never gave the defendant permission to drive his car, and that, to his knowledge, the defendant had never been in his car prior to the incident. "[T]he determination of the credibility of a witness is solely the function of the jury." (Internal quotation marks omitted.) *State* v. *Leniart*, 333 Conn. 88, 142, 215 A.3d 1104 (2019) The jury, therefore, was entitled to credit the victim's testimony. See, e.g., *State* v. *Holmgren*, 197 Conn. App. 203, 209, 231 A.3d 379 (2020).

In addition to the DNA evidence, the state presented other evidence in support of the defendant's guilt, apart from the challenged testimony of B. For example, at trial, the victim testified that he was robbed by a bald man with an olive skin tone whom he had picked up on New Lane Street in the early morning of July 26, 2020, and that the man initially had asked to be picked up on Main Street. Jones testified that the defendant had lived on Main Street at the time of the crime and that an analysis of the contents of his cell phone revealed that he was not active on the phone between 1:30 and 3:30 a.m. on July 26, 2020—the time frame during which the crime occurred—although he did make and receive calls before and after that time frame. Furthermore, the state submitted into evidence a police photograph of the defendant in which his chest tattoo is visible, as well as the New Lane Street and Campfield Avenue video footage, which showed a bald man wearing a tank top and shorts getting into a sedan on New Lane Street in the early morning of July 26, 2020— consistent with the victim's testimony—and what appeared to be the same vehicle being dropped off in Hartford later that morning by a bald man wearing a tank top and shorts, with a visible chest tattoo. Moreover, B testified that, in or about July, 2020, she had picked up the defendant at a location near where the

victim's car was found in Hartford. The defendant has not challenged that testimony.

In sum, contrary to the defendant's argument, the state's overall case against the defendant was quite strong due to the DNA and circumstantial evidence presented, aside from B's identification testimony. It is also noteworthy that the trial court permitted defense counsel to engage in unfettered cross-examination of B—a factor that weighs against concluding that the claimed error harmed the defendant. See *State* v. *Outlaw*, supra, 350 Conn. 283–84. In light of the other compelling evidence on which the jury could have based its verdict, we cannot conclude that B's identification testimony substantially swayed the jury's verdict. See, e.g., *State* v. *Lindsay*, supra, 143 Conn. App. 170; see also *State* v. *Outlaw*, supra, 283–84. Accordingly, the defendant has not met his burden of demonstrating that he was harmed by the court's admission of B's identification testimony.

## II

The defendant next claims that the court committed plain error by failing to give the jury an instruction regarding B's identification testimony. Specifically, he argues that "[t]he jury was given no guidance about how to use B's testimony. It was not told how to assess the quality of the video. It was not told how to weigh the significance of B's familiarity with [the defendant]. . . . Although [the defendant] did not ask for a specific instruction about identification and did not object to the . . . court's instruction as given,[21] the . . . court

---

[21] It is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), unless they have been induced or implicitly waived. See *State* v. *Kitchens*, 299 Conn. 447, 468, 10 A.3d 942 (2011). "Connecticut courts have deemed a claim of instructional error implicitly waived when the defense failed to take exception to, and acquiesced in, the jury instructions following one or more opportunities to review them." Id., 480. The fact that a challenge to a jury instruction has been implicitly

should have recognized that the jury needed guidance about using B's testimony and about the risk that she might be mistaken, despite her familiarity with [the defendant]. The failure to give such an instruction was plain error."[22] (Citations omitted; footnote added.) We disagree.[23]

We first set forth the standard of review and legal principles that govern claims of plain error. Our review

waived under *Kitchens*, as in the present case, however, does not foreclose "appellate relief under the plain error doctrine." *State* v. *McClain*, 324 Conn. 802, 808, 155 A.3d 209 (2017). We, therefore, address the defendant's claim of plain error.

[22] The defendant also asserts that the court did not instruct the jury in accordance with model criminal jury instruction § 2.6-4 pertaining to an eyewitness' identification of a defendant, which provides: "You may also consider the strength of the [witness'] initial identification of the defendant, including the degree of certainty expressed by the witness at the time of that identification. Certainty, however, does not necessarily mean accuracy. You should also take into account the circumstances under which the witness first viewed and identified the defendant and the suggestibility, if any, of the procedure used in that viewing." See Connecticut Criminal Jury Instructions 2.6-4, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited May 28, 2025). We find no merit to this claim, as the present case involves an identification by a nonpercipient witness, not an eyewitness. See footnote 14 of this opinion.

[23] The defendant also requests, in a cursory fashion, that this court exercise its supervisory authority over the administration of justice to craft a cautionary instruction that addresses "the increasingly common situation of nonpercipient witness[es] making identifications from video[s]." In his appellate briefs, the defendant has failed to set forth the standard under which this court may invoke its supervisory authority, to provide any legal analysis of the applicable law to the facts of this case, and to explain why this is an appropriate case for this court to exercise its supervisory powers. "We are not required to review issues that have been improperly presented to this court through an inadequate brief . . . . Analysis, rather than [mere] abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *State* v. *Colon*, 232 Conn. App. 122, 130 n.9,      A.3d      (2025), petition for cert. filed (Conn. May 21, 2025) (No. 240375). Therefore, we decline to review the defendant's claim that we should exercise our supervisory powers. See id. (declining to review claim as to supervisory authority because it was inadequately briefed).

"with respect to whether to reverse a trial court's judgment under the plain error doctrine is plenary." *State* v. *Kyle A.*, 348 Conn. 437, 446, 307 A.3d 249 (2024). "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. . . . Put another way, plain error review is reserved for only the most egregious errors." (Citation omitted; internal quotation marks omitted.) Id., 445.

To prevail on an unpreserved claim under the plain error doctrine, "the defendant must satisfy the two-pronged plain error test. First, the defendant must establish that there was an obvious and readily discernable error . . . ." (Internal quotation marks omitted.) *State* v. *Diaz*, 348 Conn. 750, 762, 311 A.3d 714 (2024). "Second, the defendant must establish that the obvious and readily discernable error was so harmful or prejudicial that it resulted in manifest injustice. . . . In sum, reversal is required only if the alleged error is *both* so clear *and* so harmful that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 763; see also *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017) ("plain error . . . is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings" (internal quotation marks omitted)).

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge

to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate [on] legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Inzitari*, 351 Conn. 86, 103–104, 329 A.3d 215 (2025), petition for cert. docketed (U.S. May 14, 2025) (No. 24-7203).

We conclude that, because the defendant has not demonstrated the existence of " 'an obvious and readily discernable error' "; *State* v. *Diaz*, supra, 348 Conn. 762; in the trial court's jury instructions, his claim of plain error fails. Our Supreme Court "has explained that whether an error is clear is premised on the law existing at the time of trial. See *State* v. *Darryl W.*, 303 Conn. 353, 374, 33 A.3d 239 (2012) ('[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine' . . .); *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011) (same) . . . ." (Citation omitted.) *State* v. *Turner*, 334 Conn. 660, 683–84, 224 A.3d 129 (2020). For example, in *State* v. *Christopher S.*, 338 Conn. 255, 293–94 n.12, 257 A.3d 912 (2021), the defendant requested that our Supreme Court exercise its supervisory authority over the administration of justice to require trial courts to instruct juries concerning statements obtained by custodial interrogation and also claimed that the trial court's failure to provide such an instruction constituted plain error. In rejecting the claim of plain error, our Supreme Court stated: "Given that the defendant is asking us to invoke our supervisory

authority to require a jury instruction that was not previously required, we fail to see how the trial court's failure to sua sponte give that instruction constituted plain error." Id., 294 n.12.

When our Supreme Court decided *Gore* in 2022, prior to the defendant's trial in the present case in 2023, it noted only that a "trial court *may* provide a cautionary jury instruction. See, e.g., *State* v. *Harris*, [330 Conn. 91, 134–35, 191 A.3d 119 (2018)] ('it *may* be appropriate for the trial court to craft jury instructions to assist the jury in its consideration of [the reliability of eyewitness testimony]')." (Emphasis added.) *State* v. *Gore*, supra, 342 Conn. 163. The defendant, therefore, cannot establish that the court committed plain error in failing to provide the jury with an instruction that it was not required to give and that our Supreme Court has stated *may* be appropriate in a given case. See *State* v. *Christopher S.*, supra, 338 Conn. 293–94 n.12; see also *State* v. *Kyle A.*, supra, 348 Conn. 447–48 (trial court did not commit plain error in failing to give jury instruction that has been deemed discretionary in nature and is not mandatory).

Our Supreme Court has "emphasize[d] that it has been especially rare for a jury instruction to be so clearly improper that our courts have deemed plain error review necessary to correct it. See *State* v. *Kelly*, 256 Conn. 23, 58 n.18, 770 A.2d 908 (2001).This court has done so when the trial court has affirmatively misstated the law; see *State* v. *Preyer*, 198 Conn. 190, 198–200, 502 A.2d 858 (1985) (concluding that trial court committed plain error when it incorrectly instructed jury that cohabitation was not defense to charge of sexual assault in first degree); and when it has failed to comply with a statute that mandates a particular instruction. See *State* v. *Ruocco*, 322 Conn. 796, 801–802, 144 A.3d 354 (2016) (concluding that trial court committed plain error when it failed to instruct jury, as required

by statute, that it could not draw unfavorable inferences from defendant's failure to testify). We do not suggest that there are no other circumstances in which an instruction could constitute plain error, but the reluctance with which we have chosen that course underscores that plain error is reserved for only the most egregious defects." *State* v. *Kyle A.*, supra, 348 Conn. 448. In the present case, the defendant has not argued that the instructions given misstated the law or were inaccurate; rather, he contends that the court "should have recognized that the jury needed guidance about using [B's] testimony and about the risk that she might be mistaken, despite her familiarity with [the defendant]." We cannot conclude that the court's failure to provide the jury with such an instruction constitutes the type of egregious defect or " 'truly extraordinary' situation" warranting reversal under the plain error doctrine.[24] *State* v. *Kyle A.*, supra, 448. Accordingly, the defendant's claim that the court committed plain error by failing to give the jury an instruction concerning nonpercipient witnesses fails.[25]

[24] On January 31, 2025, the defendant's appellate counsel filed a notice of supplemental authority alerting this court to two Massachusetts cases concerning jury instructions pertaining to identifications from a video recording. See *Commonwealth* v. *Fisher*, 492 Mass. 823, 216 N.E.3d 1218 (2023); *Commonwealth* v. *Belnavis*, 104 Mass. App. 798, 244 N.E.3d 1052 (2024). We do not find these cases pertinent to the issue before us—whether the trial court committed plain error in failing to provide the jury with an instruction on nonpercipient witness identifications.

[25] Although we reject this claim and decline to invoke the "*extraordinary* remedy"; (emphasis in original; internal quotation marks omitted) *State* v. *Carlson*, 226 Conn. App. 514, 546, 318 A.3d 283, cert. denied, 350 Conn. 911, 324 A.3d 143 (2024); of exercising our supervisory authority in the manner requested by the defendant, we encourage the Judicial Branch's Criminal Jury Instruction Committee to develop a model jury instruction for use in similar situations. Also, to avoid similar claims in the future, we urge trial courts, henceforth, to provide juries with a cautionary instruction in cases in which a lay witness identifies a defendant in court from a surveillance video or photograph. See *State* v. *Gore*, supra, 342 Conn. 163 (recognizing that trial courts "may provide a cautionary jury instruction" in cases involving lay opinion testimony identifying a defendant via surveillance video footage); see also *People* v. *Mosley*, 41 N.Y.3d 640, 650, 239 N.E.3d 928, 215 N.Y.S.3d

The judgment is affirmed.

In this opinion the other judges concurred.

———————————

303 (2024) (noting that, when court admits nonpercipient identification testimony, "as a best practice, it would be appropriate for . . . [it] to provide cautionary jury instructions, both at the time of the testimony and during the final charge, explaining to the jury that [nonpercipient] [witness] identification testimony is mere opinion testimony that [the jury] may choose to accept or reject, and reminding the jurors that because they are the finders of fact, it is their opinion as to whether the defendant is depicted in the surveillance footage that matters").